[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
NOVEMBER 22, 2011
JOHN LEY
CLERK

_____

No. 08-15444

_____

D. C. Docket No. 04-00151-CV-WLS

WARREN LEE HILL, JR.,

Petitioner-Appellant,

versus

CARL HUMPHREY,

Respondent-Appellee.

_____

Appeal from the United States District Court
for the Middle District of Georgia

_____

(November 22, 2011)

Before DUBINA, Chief Judge, TJOFLAT, EDMONDSON, CARNES,
BARKETT, HULL, MARCUS, WILSON, PRYOR, MARTIN and BLACK,
Circuit Judges.

HULL, Circuit Judge:

In 1996 state habeas proceedings, Warren Lee Hill, Jr. unsuccessfully alleged that he is mentally retarded and ineligible for the death penalty. Hill, a Georgia death row inmate, was able to raise this claim in 1996, well before the Atkins decision[1] was issued in 2002, because in 1988 the State of Georgia led the nation by abolishing the death penalty for mentally retarded defendants. See O.C.G.A. § 17-7-131 (1988 statute prohibiting death penalty where defendant proves mental retardation beyond reasonable doubt).

Although Georgia already prohibited executing mentally retarded defendants at the time of Hill's trial, direct appeal, and initial state habeas petition, Hill did not claim he was mentally retarded until five years after his 1991 trial. In 1996, Hill amended his state habeas petition to allege mental retardation for the first time, and he later claimed that Georgia's reasonable doubt standard of proof in O.C.G.A. § 17-7-131 violated the Eighth Amendment.

The national consensus against executing the mentally retarded that gave birth to the Atkins prohibition was a consensus that Georgia started by enacting the very same statute — § 17-7-131(c)(3), (j) — that petitioner Hill now claims violates Atkins by using a reasonable doubt standard. In Hill's state habeas appeal

_____

[1]Atkins v. Virginia, 536 U.S. 304, 122 S. Ct. 2242 (2002) (recognizing national consensus against execution of mentally retarded persons, and concluding such executions violated Eighth Amendment's ban on cruel and unusual punishments).

2

in 2003, and after <u>Atkins</u>, the Georgia Supreme Court held that the reasonable doubt standard in § 17-7-131 comports with the Eighth and Fourteenth Amendments. <u>Head v. Hill</u>, 587 S.E.2d 613, 621-22 (Ga. 2003) ("<u>Hill III</u>"). The Georgia Supreme Court recently reaffirmed its holding in <u>Hill III</u> that Georgia's beyond a reasonable doubt standard for proving mental retardation is constitutional. <u>See</u> <u>Stripling v. State</u>, 711 S.E.2d 665, 668 (Ga. 2011) ("We have previously addressed this very issue, and we now reiterate our prior holding that Georgia's beyond a reasonable doubt standard is not unconstitutional.") (citing <u>Hill III</u>, 587 S.E.2d at 620-22).

In this appeal under the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), <u>codified in</u> 28 U.S.C. § 2254, the sole legal issue before this en banc court is:

> Pursuant to AEDPA's § 2254(d)(1), is the Georgia Supreme Court's decision in <u>Head v. Hill</u>, 587 S.E.2d 613, 620-22 (Ga. 2003)—that Georgia's statutory reasonable doubt standard for capital defendants' mental retardation claims does not violate the Eighth Amendment—contrary to clearly established federal law, as announced in <u>Atkins v. Virginia</u>, 536 U.S. 304, 122 S. Ct. 2242 (2002)?[2]

In § 2254 cases, federal courts do not review state courts' decisions <u>de novo</u>. Rather, Congress restricted federal review to whether the state court's decision is

---

[2]The Eighth Amendment issue is the sole question the parties were directed to brief, and we precisely quote the issue from the briefing instructions.

"contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States" as of the date of the state court decision. 28 U.S.C. § 2254(d)(1) (emphasis added). Discussing § 2254(d)(1) specifically, and reversing federal circuit courts for granting habeas relief, the Supreme Court has admonished: "A legal principle is 'clearly established' within the meaning of this provision only when it is embodied in a holding of this [Supreme] Court." Thaler v. Haynes, 559 U.S. —, 130 S. Ct. 1171, 1173 (2010); see Berghuis v. Smith, 559 U.S. —, 130 S. Ct. 1382, 1392, 1395-96 (2010). AEDPA established a "highly deferential standard for evaluating state-court rulings." Renico v. Lett, 559 U.S. —, 130 S. Ct. 1855, 1862 (2010).

As the Georgia Supreme Court correctly noted, there is no holding in Atkins, or any Supreme Court decision, invalidating a reasonable doubt standard for mental retardation claims. Just the opposite is true. Atkins expressly left it for the states to develop the procedural and substantive guides for determining who is mentally retarded. Bobby v. Bies, 556 U.S. 825, —, 129 S. Ct. 2145, 2150 (2009). And in the 219-year history of our nation's Bill of Rights, no United States Supreme Court decision has ever suggested, much less held, that a burden of proof standard on its own can so wholly burden an Eighth Amendment right as to

4

eviscerate or deny that right.[3]  Because there is no specific, much less "clearly established" by Supreme Court precedent, federal rule regarding the burden of proof for mental retardation claims, AEDPA mandates that this federal court leave the Georgia Supreme Court decision alone—even if we believe it incorrect or unwise—and affirm in this case.  See Harrington v. Richter, 562 U.S. —, 131 S. Ct. 770, 786 (2011) ("It is not an unreasonable application of clearly established Federal law for a state court to decline to apply a specific legal rule that has not been squarely established by this Court." (brackets and quotation marks omitted)); Lett, 559 U.S. at —, 130 S. Ct. at 1862 ("We have explained that 'an unreasonable application of federal law is different from an incorrect application of federal law.'").

## I.  BACKGROUND

It is important to the burden of proof issue that the whole story of this case be told.  So we start at the beginning.

## A.  Mental Retardation and the Death Penalty

In 1988, the Georgia General Assembly passed the nation's first statute

---

[3]Atkins is not based on the Fourteenth Amendment's Due Process Clause and a defendant's procedural right to a fair criminal trial, but only on the Eighth Amendment's cruel and unusual punishment prohibition.  The narrow question before the en banc court thus concerns only the Eighth Amendment and AEDPA's highly deferential review of state court decisions.

prohibiting the execution of mentally retarded persons. Specifically, O.C.G.A. §

17-7-131(c)(3) and (j) state:

> [A criminal] defendant may be found "guilty but mentally retarded" <u>if the jury, or court acting as trier of facts, finds beyond a reasonable doubt that the defendant is guilty of the crime charged and is mentally retarded</u>. If the court or jury should make such finding, it shall so specify in its verdict.
> . . .
> In the trial of any case in which the death penalty is sought which commences on or after July 1, 1988, <u>should</u> the judge find in accepting a plea of guilty but mentally retarded or <u>the jury or court find in its verdict that the defendant is guilty of the crime charged but mentally retarded, the death penalty shall not be imposed</u> and the court shall sentence the defendant to imprisonment for life.

O.C.G.A. § 17-7-131(c)(3), (j) (emphasis added).

One year later, in <u>Penry v. Lynaugh</u>, 492 U.S. 302, 109 S. Ct. 2934 (1989),

the United States Supreme Court concluded that the Eighth Amendment did not

prohibit the execution of the mentally retarded.[4] The Supreme Court noted that, as

of that time, "[o]nly one State . . . currently bans execution of retarded persons who

have been found guilty of a capital offense." <u>Id.</u> at 334, 109 S. Ct. at 2955 (citing

Georgia's O.C.G.A. § 17-7-131(j)).

---

[4]Shortly after the passage of O.C.G.A. § 17-7-131(c)(3) and (j), the Georgia Supreme Court upheld a <u>state</u> constitutional challenge to the death penalty as applied to mentally retarded defendants who were tried before the effective date of the statute. <u>Fleming v. Zant</u>, 386 S.E.2d 339 (Ga. 1989), <u>superseded in part by statute</u>, <u>Turpin v. Hill</u>, 498 S.E.2d 52, 53-54 (Ga. 1998). Thus, thirteen years before <u>Atkins</u> in 2002, the Georgia Supreme Court concluded that executing a mentally retarded defendant constitutes cruel and unusual punishment <u>as defined in the Georgia Constitution</u>. <u>Id.</u> at 342.

Then in 2002, the United States Supreme Court overruled <u>Penry</u> in <u>Atkins v. Virginia</u>, 536 U.S. 304, 122 S. Ct. 2242 (2002), and declared that the Eighth Amendment's "cruel and unusual punishment" provision prohibited the execution of mentally retarded offenders.  <u>Id.</u> at 315-21, 122 S. Ct. at 2249-52.

Although the Supreme Court in <u>Atkins</u> recognized a national consensus against executing mentally retarded persons, it said that there was a notable lack of consensus on <u>how</u> to determine which offenders are mentally retarded:

> To the extent there is serious disagreement about the execution of mentally retarded offenders, it is in determining which offenders are in fact retarded. . . .  Not all people who claim to be mentally retarded will be so impaired as to fall within the range of mentally retarded offenders about whom there is a national consensus.

<u>Atkins</u>, 536 U.S. at 317, 122 S. Ct. at 2250.  The Supreme Court added that although the states' "statutory definitions of mental retardation are not identical, [they] generally conform to the clinical definitions" established by the American Association on Mental Retardation ("AARM," now known as the American Association on Intellectual and Developmental Disabilities) and the American Psychiatric Association ("APA").  <u>Atkins</u>, 536 U.S. at 317 n.22, 122 S. Ct. at 2250 n.22.  The AARM's and APA's definitions of mental retardation contain three basic requirements: (1) significantly subaverage general intellectual functioning, as reflected by an IQ generally about 70 or below; (2) limitations in adaptive

7

functioning; and (3) onset before age 18.  <u>Id.</u> at 308 n.3, 122 S. Ct. at 2245 n.3.

In <u>Atkins</u>, the Supreme Court was careful not to fix the burden of proof or to impose rigid definitions of mental retardation.  Instead, the Court left it to the states to develop "appropriate" procedures for mental retardation determinations:

> As was our approach in <u>Ford v. Wainwright</u>, 477 U.S. 399, 106 S. Ct. 2595, 91 L.Ed.2d 335 (1986), with regard to insanity, we leave to the States the task of developing appropriate ways to enforce the constitutional restriction upon their execution of sentences.

<u>Id.</u> (quotation marks and brackets omitted).  As the Georgia Supreme Court noted in <u>Hill III</u>, the Supreme Court in <u>Atkins</u> "made clear that it was entrusting the states with the power to develop the procedures necessary to enforce the newly recognized federal constitutional ban."  <u>Hill III</u>, 587 S.E.2d at 620 (citing <u>Atkins</u>, 536 U.S. at 317, 122 S. Ct. at 2250).

Later, in <u>Bobby v. Bies</u>, 556 U.S. 825, 129 S. Ct. 2145 (2009), the Supreme Court pointed out that <u>Atkins</u> "did not provide definitive procedural or substantive guides for determining when a person who claims mental retardation 'will be so impaired as to fall within <u>Atkins</u>' compass.'" 556 U.S. at ___, 129 S. Ct. at 2150 (brackets omitted).  In its 2009 <u>Bies</u> decision, the Supreme Court repeated that <u>Atkins</u> had "left to the States the task of developing appropriate ways to enforce the constitutional restriction" on executing the mentally retarded.  <u>Id.</u> (brackets omitted).

8

We turn to how the Georgia reasonable doubt statute and <u>Atkins</u> intersect with Hill's case.

**B.      Facts and Procedural History**

In 1990, while Hill was serving a life sentence for the murder of his girlfriend, he murdered another person in prison.  Using a nail-studded board, Hill bludgeoned a fellow inmate to death in his bed.  As his victim slept, "Hill removed a two-by-six board that served as a sink leg in the prison bathroom and forcefully beat the victim numerous times with the board about the head and chest as onlooking prisoners pleaded with him to stop."  <u>Hill III</u>, 587 S.E.2d at 618.  Hill "mocked the victim as he beat him."  <u>Id.</u>  Even locked up in jail for one murder, Hill continued to kill.

A jury unanimously convicted Hill of malice murder and unanimously imposed a death sentence.  <u>See</u> <u>Hill v. State</u>, 427 S.E.2d 770, 774 (Ga. 1993) ("<u>Hill I</u>").  Despite the fact that O.C.G.A. § 17-7-131(c)(3) and (j) already exempted mentally retarded persons from execution at the time of Hill's trial, <u>Hill did not assert at trial that he was mentally retarded</u>.  To the contrary, Hill called clinical psychologist William Dickinson, who testified that Hill's IQ was 77 and he was not mentally retarded.

On direct appeal in 1993, the Georgia Supreme Court affirmed Hill's malice

9

murder conviction and death sentence. <u>Hill I</u>, 427 S.E.2d at 772. <u>On direct appeal, Hill made no claim of mental retardation</u>.

In 1994, Hill filed a state habeas petition. <u>Again he made no mental retardation claim</u>. But five years after trial, Hill amended his petition to allege, <u>inter alia</u>, that he is mentally retarded. In 1997, the state habeas court granted Hill a writ of habeas corpus for the limited purpose of conducting a jury trial on Hill's mental retardation claim, using a preponderance of the evidence standard.

The State appealed, and the Georgia Supreme Court reversed. <u>Turpin v. Hill</u>, 498 S.E.2d 52 (Ga. 1998) ("<u>Hill II</u>").[5] The Georgia Supreme Court concluded that § 17-7-131's requirement that a defendant prove his mental retardation beyond a reasonable doubt applies to all defendants tried after the statute's effective date in 1988. <u>Id.</u> at 53-54. The Georgia Supreme Court remanded Hill's case to the state habeas court to determine, without a jury, whether Hill could establish under the reasonable doubt standard that he is mentally retarded. <u>Id.</u>

On remand, the state habeas court ordered mental evaluations, conducted an

---

[5]The Georgia Supreme Court noted that (1) Hill was tried three years after the 1988 effective date of § 17-7-131(c)(3) and (j), and (2) Hill never alleged (either at trial in 1991 or on direct appeal in 1993) that he was mentally retarded. <u>Hill II</u>, 498 S.E.2d at 52. Therefore, Hill's claim was procedurally defaulted. <u>Id.</u> Nevertheless, the Georgia Supreme Court concluded that, to the extent that Hill's mental retardation claim challenged the imposition of the death penalty, it fell within Georgia's "miscarriage of justice" exception to its procedural default rules. <u>Id.</u> at 53. Thus, Georgia has allowed death-sentenced inmates to raise the mental retardation bar in collateral proceedings even if procedurally defaulted.

evidentiary hearing, and then denied all of Hill's claims. In a May 2002 order, the state habeas court concluded that Hill had not proven he was mentally retarded under the reasonable doubt standard. The state habeas court employed the definition of mental retardation in O.C.G.A. § 17-7-131(a)(3), which provides that "mentally retarded" means (1) having "significantly subaverage general intellectual functioning," (2) "resulting in or associated with impairments in adaptive behavior," (3) "which manifested during the developmental period." Georgia's definition essentially tracks the AARM and APA definitions mentioned in Atkins.[6]

As to the first prong, the state habeas court found that Hill established beyond a reasonable doubt his "significantly subaverage general intellectual functioning."[7]

---

[6]In Stripling v. State, 401 S.E.2d 500 (Ga. 1991), the Georgia Supreme Court stated that the "significantly subaverage general intellectual functioning" prong of the mental retardation definition "is generally defined as an IQ of 70 or below," but that "an IQ test score of 70 or below is not conclusive" because "an IQ score is only accurate within a range of several points, and for a variety of reasons, a particular score may be less accurate." Id. at 504. Similarly, in Atkins, the Supreme Court noted that an IQ score between 70 and 75 "is typically considered the cutoff IQ score for the intellectual function prong of the mental retardation definition." Atkins, 536 U.S. at 309 n.5, 122 S. Ct. at 2245 n.5. The Atkins Court also stated, "'[m]ild' mental retardation is typically used to describe people with an IQ level of 50–55 to approximately 70." Id. at 308 n.3, 122 S. Ct. at 2245 n.3.

[7]Before trial in 1991, clinical psychologist Dickinson evaluated Hill using the Wechsler Adult Intelligence Scale, Revised ("WAIS-R") test. Hill's full-scale IQ score on the WAIS-R was 77. Dickinson also administered to Hill in 1991 the Peabody Picture Vocabulary Test ("PPVT"), on which Hill earned an estimated IQ score of 74. Records show Hill took the PPVT when he was in second grade and scored a 75.
In 1997, in Hill's state habeas proceedings, Dr. Daniel Grant evaluated Hill using the Stanford-Binet Intelligence Test, and Hill received an IQ score of 72. In 2000, Dr. Jethro Toomer administered the Wechsler Adult Intelligence Scale III ("WAIS-III") to Hill. Hill's full-

11

As to the second prong, however, the state habeas court found Hill failed to show beyond a reasonable doubt that he had "impairments in adaptive behavior" such as "communication, self-care, home living, social/interpersonal skills, use of community resources, self direction, functional academic skills, work, leisure, health, and safety." The state habeas court noted Hill's (1) extensive work history and "apparent ability to function well in such employment," (2) disciplined savings plans to purchase cars and motorcycles, (3) military service, (4) social life, (5) weak but sufficient writing skills, (6) ability to care for himself in home living except in periods of stress, and (7) health problems with seizures. The state habeas court did not discuss the third prong of the mental retardation test, which is onset before age 18.

After the Supreme Court issued Atkins in June 2002, Hill moved the state habeas court to reconsider its denial in light of Atkins. Granting Hill's motion, the state habeas court in November 2002 concluded that a preponderance of the evidence standard should be applied to Hill's mental retardation claim. Although the state habeas court did not retreat from its earlier finding that Hill failed to show

scale IQ score on the WAIS-III was 69.

Hill produced an affidavit from Dickinson in 2000 stating that his earlier finding of no mental retardation was erroneous because it was based on inadequate information, and his original IQ testing of Hill led to an inaccurate and misleading result. See Hill II, 498 S.E.2d at 52 n.1. In this affidavit, Dickinson opined that the 1991 WAIS-R overestimated Hill's IQ by 3-7 points; given Dickinson's original score of 77, this still results in a range of 70-74.

he was mentally retarded under the reasonable doubt standard, the court stated it would find Hill to be mentally retarded under the preponderance of evidence standard.

The State appealed. In 2003 the Georgia Supreme Court again reversed the state habeas court. See Hill III, 587 S.E.2d at 618. The Georgia Supreme Court concluded: (1) Hill could have had a jury trial on mental retardation under O.C.G.A. § 17-7-131(c)(3) at the time of his original guilt trial in 1991 if he had asked for one, but he waived that right; (2) Hill was only entitled to have the state habeas court—not a jury—assess his mental retardation claim;[8] (3) Atkins applied retroactively, but Atkins entrusted to the states the task of developing procedures to enforce the ban on executing the mentally retarded; (4) "nothing in Atkins instructs the states to apply any particular standard of proof to mental retardation claims"; and (5) the Supreme Court's decision in Leland v. Oregon, 343 U.S. 790, 72 S. Ct. 1002 (1952), which upheld as constitutional the reasonable doubt standard for insanity claims, supported Georgia's reasonable doubt standard in Hill's case. Hill III, 587 S.E.2d at 619-21.

The Georgia Supreme Court concluded that Georgia's reasonable doubt

---

[8]Hill does not complain about having the state habeas judge, as opposed to a jury, decide his mental retardation claim, given that he had a statutory right to raise the issue in his initial jury trial but he did not raise it until five years later, in state habeas proceedings.

standard was constitutionally acceptable for mental retardation claims.  Id.  The

Georgia Supreme Court explained that O.C.G.A. § 17-7-131's reasonable doubt

standard reflected an acceptable state legislative choice to define as mentally

retarded those defendants who are able to prove their mental retardation beyond a

reasonable doubt:

> [A] higher standard of proof serves to enforce the General Assembly's
> chosen definition of what degree of impairment qualifies as mentally
> retarded under Georgia law for the purpose of fixing the appropriate
> criminal penalty that persons of varying mental impairment should
> bear for their capital crimes . . . . [T]he Court in Atkins recognized
> that, despite a "national consensus" against executing mentally
> retarded persons, there might be "serious disagreement . . . in
> determining which offenders are in fact retarded."  In view of the lack
> of national consensus as to which mentally impaired persons are
> constitutionally entitled to an exemption from death sentences, we
> conclude that the Georgia General Assembly . . . was originally and
> remains within constitutional bounds in establishing a procedure for
> considering alleged mental retardation that limits the exemption to
> those whose mental deficiencies are significant enough to be provable
> beyond a reasonable doubt.

Id. at 622 (citations omitted).  The Georgia Supreme Court vacated the state habeas

court's November 2002 order (granting Hill's motion for reconsideration and

finding that Hill had established he was mentally retarded by a preponderance of

the evidence).  Id. at 623.  The Georgia Supreme Court remanded Hill's case to the

state habeas court for entry of an order denying Hill's state habeas petition.  See id.

at 618, 622-23.  On remand, the state habeas court reinstated its May 2002 order,

14

finding Hill failed to prove mental retardation beyond a reasonable doubt. The state habeas court's final order does not contain a preponderance of the evidence finding either way.

In 2004, Hill filed a § 2254 petition, alleging that Georgia's reasonable doubt standard for mental retardation violates the Eighth and Fourteenth Amendments. The district court denied relief. Hill appealed. A panel of this Court reversed, and we granted en banc rehearing and vacated the panel opinion. Hill v. Schofield, 625 F.3d 1313 (11th Cir.), vacating Hill v. Schofield, 608 F.3d 1272 (11th Cir. 2010). As stated earlier, the sole question before the en banc Court is whether the Georgia Supreme Court's decision in Hill III—holding that Georgia's reasonable doubt standard does not violate the Eighth Amendment— "is contrary to clearly established federal law, as announced in Atkins."

## II.  STANDARD OF REVIEW

Hill's § 2254 petition and appeal are governed by AEDPA. Owen v. Sec'y, Dep't of Corr., 568 F.3d 894, 907 (11th Cir. 2009), cert. denied, 130 S. Ct. 1141 (2010). "Under AEDPA, our review of a final state habeas decision is 'greatly circumscribed and is highly deferential to the state courts.'" Payne v. Allen, 539 F.3d 1297, 1312 (11th Cir. 2008) (quoting Crawford v. Head, 311 F.3d 1288, 1295 (11th Cir. 2002)). Under 28 U.S.C. § 2254(d)(1), as amended by AEDPA, a state

prisoner cannot obtain federal habeas relief unless he can show the decision of the state court "was contrary to, or involved an unreasonable application of, clearly established Federal law . . . ." 28 U.S.C. § 2254(d)(1) (emphasis added). In this case, the only question is whether the Georgia Supreme Court's decision—that the reasonable doubt standard for mental retardation claims is constitutional—is "contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States." Id.[9]

In 2010-11 alone, the Supreme Court has reversed circuit appellate courts in ten decisions for not adhering to AEDPA's requirements. See Bobby v. Dixon, 565 U.S. —, — S.Ct. —, 2011 WL 5299458, No. 10-1540 (U.S. Nov. 7, 2011); Bobby v. Mitts, 563 U.S. —, 131 S. Ct. 1762 (2011); Cullen v. Pinholster, 563 U.S. —, 131 S. Ct. 1388 (2011); Felkner v. Jackson, 562 U.S. —, 131 S. Ct. 1305 (2011); Premo v. Moore, 562 U.S. —, 131 S. Ct. 733 (2011); Richter, 131 S. Ct. 770 (2011); Lett, 130 S. Ct. 1855 (2010); Berghuis, 130 S. Ct. 1382 (2010); Haynes, 130 S. Ct. 1171 (2010); Smith v. Spisak, 558 U.S. —, 130 S. Ct. 676 (2010). We briefly review a few of those decisions.

Starting with Haynes, the Supreme Court instructed: "A legal principle is

_____

[9]We review de novo the legal conclusions reached by the district court in denying Hill's § 2254 petition. Owen, 568 F.3d at 907. We review the district court's factual findings for clear error, and mixed questions of law and fact de novo. Id.

16

'clearly established' within the meaning of this provision <u>only when it is embodied in a holding of this Court.</u>"  <u>Haynes</u>, 130 S. Ct. at 1173 (citing <u>Carey v. Musladin</u>, 549 U.S. 70, 74, 127 S. Ct. 649, 653 (2006); <u>Williams v. Taylor</u>, 529 U.S. 362, 412, 120 S. Ct. 1495, 1523 (2000)) (emphasis added); <u>see also</u> <u>Owen</u>, 568 F.3d at 907 ("'Clearly established Federal law' means the holdings, not the dicta, of the United States Supreme Court.").

In <u>Haynes</u>, the Supreme Court unanimously reversed the Fifth Circuit's decision, which had concluded that a state court judge in ruling on a <u>Batson</u> challenge must reject a demeanor-based explanation for a challenge unless that judge personally observed and recalls the aspect of the prospective juror's demeanor on which the explanation is based.  <u>Haynes</u>, 130 S. Ct. at 1172.  After the Texas appellate court denied state habeas relief, the Fifth Circuit concluded that <u>Batson v. Kentucky</u>, 476 U.S. 79, 106 S. Ct. 1712 (1986), and <u>Snyder v. Louisiana</u>, 552 U.S. 472, 128 S. Ct. 1203 (2008), "clearly established" that rule and on that basis granted federal habeas relief.  <u>Id.</u> at 1173-74.  In <u>Snyder</u>, the Supreme Court actually had (1) stressed that when the explanation for a peremptory challenge "invoke[s] a juror's demeanor," the trial judge's "first hand observations" are of "great[] importance," and (2) pointed out that the peremptory challenge (based on nervousness) was not exercised until some time after the juror was questioned and

17

the state trial judge might not have recalled that juror's demeanor. Snyder, 552 U.S. at 477, 479, 128 S. Ct. at 1208-09. Despite Batson and Snyder, the Supreme Court in Haynes concluded the Fifth Circuit "read far too much into those decisions" and "no decision of this Court clearly establishes the categorical rule on which the [Fifth Circuit] Court of Appeals appears to have relied." Haynes, 130 S. Ct. at 1172, 1175.

A month later, in Berghuis v. Smith, the Supreme Court unanimously reversed the Sixth Circuit's decision, which had concluded that in determining whether a jury venire was drawn from a fair cross-section of the community, "courts should use the comparative disparity test to measure underrepresentation" where the allegedly excluded group is small, and the defendant's comparative disparity statistics demonstrate that African-Americans' representation in the County Circuit Court venires is "unfair and unreasonable." Berghuis, 130 S. Ct. at 1391 (citing Smith v. Berghuis, 543 F.3d 326, 338 (6th Cir. 2008)). In granting federal habeas relief after the Michigan Supreme Court had denied relief, the Sixth Circuit relied on Duren v. Missouri, 439 U.S. 357, 99 S. Ct. 664 (1979).[10]

---

[10]The Supreme Court in Duren set forth the following showing required for a prima facie claim that a petit jury was not drawn from a fair cross-section of the community:

> In order to establish a prima facie violation of the fair-cross-section requirement, the defendant must show (1) that the group alleged to be excluded is a "distinctive" group in the community; (2) that the representation of this group in venires from which juries are selected is not fair and reasonable in relation to the number of such persons in the community; and (3) that this underrepresentation is due to systematic

Reversing the Sixth Circuit, the United States Supreme Court stated, "[O]ur Duren decision hardly establishes—no less 'clearly' so—that Smith was denied his Sixth Amendment right to an impartial jury drawn from a fair cross section of the community." Berghuis, 130 S. Ct. at 1392. The Supreme Court added: "[N]either Duren nor any other decision of this Court specifies a method or test courts must use to measure the representation of distinctive groups in jury pools." Id. at 1393.

In Lett, the Supreme Court again reversed a Sixth Circuit decision concluding that the Michigan Supreme Court had unreasonably applied Supreme Court precedent regarding the Double Jeopardy Clause. 130 S. Ct. at 1860. The Supreme Court stated:

> We have explained that an unreasonable application of federal law is different from an incorrect application of federal law. Indeed, a federal habeas court may not issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly. Rather, that application must be objectively unreasonable. This distinction creates a substantially higher threshold for obtaining relief than de novo review. AEDPA thus imposes a highly deferential standard for evaluating state-court rulings and demands that state-court decisions be given the benefit of the doubt.

Id. at 1862 (citations and quotation marks omitted). The Supreme Court emphasized that "AEDPA prevents defendants—and federal courts—from using

exclusion of the group in the jury-selection process.
Duren, 439 U.S. at 364, 99 S. Ct. at 668.

federal habeas corpus review as a vehicle to second-guess the reasonable decisions

of state courts." Id. at 1866.

Richter concerned a Ninth Circuit decision holding that the California

Supreme Court had unreasonably applied the Supreme Court's Strickland v.

Washington ineffective-counsel test by not concluding that the petitioner's trial

counsel was ineffective for failing to consult with blood-evidence experts. Richter,

131 S. Ct. at 783. In reversing, the Richter Court lectured the court of appeals on

the deference owed to state court decisions pursuant to § 2254(d)(1):

> A state court's determination that a claim lacks merit precludes
> federal habeas relief so long as "fairminded jurists could disagree" on
> the correctness of the state court's decision. Yarborough v. Alvarado,
> 541 U.S. 652, 664, 124 S. Ct. 2140, 158 L. Ed. 2d 938 (2004). . . .
> "[I]t is not an unreasonable application of clearly established Federal
> law for a state court to decline to apply a specific legal rule that has
> not been squarely established by this Court." Knowles v. Mirzayance,
> 556 U.S. —, —, 129 S. Ct. 1411, 1413-14, 173 L. Ed. 2d 251 (2009)
> (internal quotation marks omitted).
> . . . .
> . . . It bears repeating that even a strong case for relief does not mean
> the state court's contrary conclusion was unreasonable. See Lockyer,
> supra, at 75, 123 S. Ct. 1166.
> > If this standard is difficult to meet, that is because it was meant
> to be. As amended by AEDPA, § 2254(d) stops short of imposing a
> complete bar on federal court relitigation of claims already rejected in
> state proceedings. Cf. Felker v. Turpin, 518 U.S. 651, 664, 116 S. Ct.
> 2333, 135 L. Ed. 2d 827 (1996) (discussing AEDPA's "modified res
> judicata rule" under § 2244). It preserves authority to issue the writ in
> cases where there is no possibility fairminded jurists could disagree
> that the state court's decision conflicts with this Court's precedents. It
> goes no farther. Section 2254(d) reflects the view that habeas corpus

is a "guard against extreme malfunctions in the state criminal justice systems," not a substitute for ordinary error correction through appeal. Jackson v. Virginia, 443 U.S. 307, 332, n. 5, 99 S. Ct. 2781, 61 L. Ed. 2d 560 (1979) (Stevens, J., concurring in judgment). As a condition for obtaining habeas corpus from a federal court, a state prisoner must show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement.

The reasons for this approach are familiar. "Federal habeas review of state convictions frustrates both the States' sovereign power to punish offenders and their good-faith attempts to honor constitutional rights." Calderon v. Thompson, 523 U.S. 538, 555-556, 118 S. Ct. 1489, 140 L. Ed. 2d 728 (1998) (internal quotation marks omitted). It "disturbs the State's significant interest in repose for concluded litigation, denies society the right to punish some admitted offenders, and intrudes on state sovereignty to a degree matched by few exercises of federal judicial authority." Reed, 489 U.S., at 282, 109 S. Ct. 1038 (KENNEDY, J., dissenting).

Section 2254(d) is part of the basic structure of federal habeas jurisdiction, designed to confirm that state courts are the principal forum for asserting constitutional challenges to state convictions.

Richter, 131 S. Ct. at 786-87 (emphasis added). Phrased "more simply and maybe a little more clearly: if some fairminded jurists could agree with the state court's decision, although others might disagree, federal habeas relief must be denied." Loggins v. Thomas, 654 F.3d 1204, 1220 (11th Cir. 2011).

And in Moore, as in Richter, the Supreme Court reversed a Ninth Circuit decision finding that a state court had unreasonably applied Strickland. Moore, 131 S. Ct. at 737-39. The Supreme Court took issue particularly with the court of appeals' conclusion that the state court's decision—that Moore's counsel was not

ineffective for failing to file a motion to suppress before advising Moore to plead guilty—was contrary to Arizona v. Fulminante, 499 U.S. 279, 111 S. Ct. 1246 (1991). Fulminante was not an ineffective assistance of counsel case, and because it did not speak to Strickland's prejudice standard or contemplate prejudice in the plea bargain context, the state court's "finding of constitutionally adequate performance under Strickland cannot be contrary to Fulminante." Moore, 131 S. Ct. at 743. The Supreme Court emphasized that the court of appeals' decision "transposed [Fulminante] into a novel context; and novelty alone—at least insofar as it renders the relevant rule less than 'clearly established'—provides a reason to reject it under AEDPA." Id.

In another recent case reversing the en banc Ninth Circuit's grant of § 2254 habeas relief, the Supreme Court admonished again that AEDPA's § 2254(d)(1) standard "is a difficult to meet" and "highly deferential standard for evaluating state-court rulings, which demands that state-court decisions be given the benefit of the doubt" and that "the petitioner carries the burden of proof." Pinholster, 131 S. Ct. at 1398. The California Supreme Court had summarily denied petitioner Pinholster's penalty-phase ineffective assistance claim in state habeas proceedings "'on the substantive ground that it is without merit.'" Id. at 1396-97, 1402. The Supreme Court reversed the en banc determination that the California Supreme

22

Court had unreasonably applied Strickland, concluding that the federal court of appeals had not applied the requisite AEDPA deference to the California Supreme Court's decision. Id. at 1401-11.

Then in Dixon, the Supreme Court reversed a Sixth Circuit decision concluding that the Ohio Supreme Court had, among other things, unreasonably applied Miranda v. Arizona, 384 U.S. 436, 86 S. Ct. 1602 (1966), and Oregon v. Elstad, 470 U.S. 298, 105 S. Ct. 1285 (1985), when it found that the petitioner's murder confession was voluntary. Dixon, 2011 WL 5299458, No. 10-1540, slip op. at 4-6. The Supreme Court noted that, under AEDPA, "a state prisoner seeking a writ of habeas corpus from a federal court 'must show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement.'" Id., slip op. at 1 (quoting Richter, 131 S. Ct. at 786-87) (emphasis added). The United States Supreme Court concluded that "[b]ecause it is not clear that the Ohio Supreme Court erred at all, much less erred so transparently that no fairminded jurist could agree with that court's decision, the Sixth Circuit's judgment must be reversed." Id. (emphasis added).

These seven § 2254(d)(1) habeas decisions emphasize that (1) petitioner Hill must show a "clearly established" federal law in the form of a United States

Supreme Court <u>holding</u> before this Court can find a Georgia Supreme Court decision unreasonable, and (2) this Court cannot find that highest state court's habeas decision unreasonable unless "no fairminded jurist could agree with that [state] court's decision." <u>Dixon</u>, slip op. at 1. This AEDPA "standard of 'contrary to, or involving an unreasonable application of, clearly established Federal law' is 'difficult to meet,' because the purpose of AEDPA is to ensure that federal habeas relief functions as a 'guard against extreme malfunctions in the state criminal justice systems,' and not as a means of error correction." <u>Greene v. Fisher</u>, 565 U.S. —, — S. Ct. —, No. 10-637, slip op. at 4 (U.S. Nov. 8, 2011) (quoting <u>Richter</u>, 131 S. Ct. at 786 (internal quotation marks, citation, and brackets omitted)).[11]

### III. DISCUSSION

---

[11]One dissent criticizes our reference to these recent Supreme Court decisions and argues these cases are not in point because they involve "dual layers of deference," <u>Lett</u>, 130 S. Ct. at 1865, that is, (1) the deference required by AEDPA, and (2) an additional underlying deferential standard of proof for the relevant claim (such as ineffective assistance of counsel). <u>Infra</u>, at 68 n.2 (Dissenting opinion of Barkett, J.). Contrary to that dissent's contentions, the parts we quote from these cases are only about the AEDPA deference, not the second layer for the underlying claim. Moreover, four of these Supreme Court decisions did not involve ineffective assistance of counsel as the underlying claim.

In this case we are obviously not taking a deferential view of, say, trial counsel's performance <u>in addition to</u> deferring, as AEDPA requires, to any reasonable decision of the Georgia Supreme Court. That fact, however, does not change the AEDPA deference standard, which does apply here. Regardless of the standard of proof for the underlying claim, the Supreme Court has repeatedly instructed, as shown above, that our AEDPA review is highly deferential <u>and</u> we may not grant habeas relief unless the state court decision is contrary to or an unreasonable application of a prior Supreme Court holding.

Hill does not challenge the state habeas court's finding that Hill has not shown he is mentally retarded beyond a reasonable doubt. The AEDPA "deference due is heavy and purposely presents a daunting hurdle for a habeas petitioner to clear." Loggins, 654 F.3d at 1220. Rather, he contends that the Georgia Supreme Court's Hill III decision upholding Georgia's statutory reasonable doubt standard is contrary to the holding in Atkins. Hill's position is that Georgia's statute (which was at the vanguard of the "national consensus" leading the Supreme Court to abolish the execution of the mentally retarded in Atkins) is now unconstitutional under the authority of Atkins—even though Atkins does not require any specific burden of proof and explicitly leaves such procedural matters to the states. For several reasons, Hill "read[s] far too much into" Atkins, and other cases he cites for that matter. Haynes, 130 S. Ct. at 1172.

## A.    Atkins **Left Procedural Rules to States**

First, the Supreme Court in Atkins made no reference to, much less reached a holding on, the burden of proof. See Haynes, 130 S. Ct. at 1173; Owen, 568 F.3d at 907. To the contrary, the Supreme Court in Atkins noted the lack of agreement as to how mental retardation is to be determined and expressly left the procedures for doing so to the states.[12]  536 U.S. at 317, 122 S. Ct. at 2250; see also Holladay

---

[12]Moreover, as part of its national consensus analysis, the Atkins Court cited the Georgia statute at issue here—O.C.G.A. § 17-7-131, which then, as now, required mental retardation to

25

v. Allen, 555 F.3d 1346, 1353 (11th Cir. 2009) ("[T]he [Supreme] Court left to the states the development of standards for determining when an offender is mentally retarded."). Therefore, Atkins provides no support for Hill's or the dissents' argument.

Atkins's decision to leave the task to the states not only renders the federal law not "clearly established," but also makes it "wholly inappropriate for this court, by judicial fiat, to tell the States how to conduct an inquiry into a defendant's mental retardation." In re Johnson, 334 F.3d 403, 405 (5th Cir. 2003) (noting that Atkins explicitly left the procedures governing its implementation to the states).[13]

In Bies, the Supreme Court in 2009 reaffirmed that "[its] opinion [in Atkins] did not provide definitive procedural or substantive guides for determining when a

_____

be proven beyond a reasonable doubt. Atkins, 536 U.S. at 313-14 & n.9, 122 S. Ct. at 2248 & n.9. Notably, there was no criticism of the Georgia statute.

[13]The state supreme courts are split on the burden of proof issue in mental retardation cases. Compare State v. Grell, 135 P.3d 696, 705 (Ariz. 2006) (finding clear and convincing evidence standard for mental retardation claims is constitutional), People v. Vasquez, 84 P.3d 1019, 1023 (Colo. 2004) (stating that "the substantive restriction of Atkins" does not limit Colorado's "discretion in allocating and quantifying the appropriate burden of proof"), and Hill III, 587 S.E.2d at 621-22, with Pruitt v. State, 834 N.E. 2d 90, 103 (Ind. 2005) (invalidating clear and convincing evidence scheme for mental retardation claims based not on clearly established Supreme Court holdings but on the "implication" of Atkins) and State v. Williams, 831 So. 2d 835, 860 (La. 2002) (stating decision to invalidate clear and convincing evidence requirement was one made in "the absence of any guidance from the Supreme Court"), superseded in part by statute, La. Code Crim. Proc. Ann. art. 905.5.1 (2003), as recognized in State v. Turner, 936 So.2d 89 (La. 2006). Unlike federal courts, state supreme courts are not constrained by AEDPA.

26

person who claims mental retardation 'will be so impaired as to fall [within <u>Atkins</u>' compass.]'" <u>Bies</u>, 129 S. Ct. at 2150.  <u>Bies</u> thus makes it clear that <u>Atkins</u> did not prescribe the burden of proof.  <u>Bies</u> even reiterated that <u>Atkins</u> "left to the States the task of developing appropriate ways to enforce the constitutional restriction." <u>Id.</u>[14]

Atkins simply did not consider or reach the burden of proof issue, and neither has any subsequent Supreme Court opinion.  We do not gainsay the possibility that the Supreme Court may <u>later</u> announce that a reasonable doubt standard for establishing the mental retardation exception to execution is constitutionally impermissible.  But under AEDPA, we are not concerned with what a United States Supreme Court holding could or should be in the future, but only what holdings of the Supreme Court established the law to be at the time the Georgia Supreme Court decided <u>Hill III</u> in 2003.

## B.    Beyond a Reasonable Doubt Standard Upheld for Insanity Defense

---

[14]In three of Georgia's post-<u>Atkins</u> death penalty cases, <u>Schofield v. Holsey</u>, 642 S.E.2d 56 (Ga.) (appeal from denial of state habeas petition), <u>cert. denied</u>, 128 S. Ct. 728 (2007); <u>Head v. Stripling</u>, 590 S.E.2d 122 (Ga. 2003) (appeal from denial of state habeas petition), <u>cert. denied</u>, 541 U.S. 1070 (2004); <u>King v. State</u>, 539 S.E.2d 783 (Ga. 2000) (direct appeal), <u>cert. denied</u>, 536 U.S. 982 (2002), the United States Supreme Court denied capital defendants' certiorari petitions that made the same constitutional reasonable doubt challenge that Hill makes here.  As <u>King v. State</u> illustrates, another avenue (certiorari petition on direct appeal) exists to present the constitutional issue here in a way that is not constrained by AEDPA deference and the requirement of clearly established federal law as shown by a United States Supreme Court holding.

27

Second, in the absence of any Supreme Court burden of proof holding in mental retardation execution cases, the Georgia Supreme Court reasonably looked to the Supreme Court's insanity decisions in Leland v. Oregon, 343 U.S. 790, 72 S. Ct. 1002 (1952) (rejecting due process challenge to reasonable doubt standard for establishing insanity plea), and Ford v. Wainwright, 477 U.S. 399, 106 S. Ct. 2595 (1986) (recognizing Eighth Amendment prohibits execution of insane persons and allowing states to decide ways to enforce that constitutional restriction). The Georgia Supreme Court determined, inter alia, that "a mental retardation claim is comparable to a claim of insanity" in that "both relieve a guilty person of at least some of the statutory penalty to which he would otherwise be subject." Hill III, 587 S.E.2d at 621. Both Leland and Ford lend enough support to the Georgia Supreme Court's decision that we cannot say "no fairminded jurist could agree with that court's decision." Dixon, 2011 WL 5299458, No. 10-1540, slip op. at 1.

At the time of Leland, Oregon was the only state that required a defendant to establish a plea of insanity beyond a reasonable doubt. Nonetheless, in Leland the Supreme Court determined that that fact was not dispositive and that Oregon's reasonable doubt standard for insanity pleas was constitutional, stating:

> Today, Oregon is the only state that requires the accused, on a plea of insanity, to establish that defense beyond a reasonable doubt. Some twenty states, however, place the burden on the accused to establish his insanity by a preponderance of the evidence or some similar

28

measure of persuasion. While there is an evident distinction between these two rules as to the quantum of proof required, <u>we see no practical difference of such magnitude as to be significant in determining the constitutional question we face here. Oregon merely requires a heavier burden of proof</u>. . . . The fact that a practice is followed by a large number of states is not conclusive in a decision as to whether that practice accords with due process, but it is plainly worth considering in determining whether the practice offends some principle of justice so rooted in the traditions and conscience of our people as to be ranked as fundamental.

<u>Leland</u>, 343 U.S. at 798, 72 S. Ct. at 1007 (footnote, quotation marks, and citation omitted) (emphasis added).[15] The <u>Leland</u> Court noted that a defense of insanity lessened one's culpability, which is the same basis used for Eighth Amendment protection in <u>Atkins</u>. <u>Id.</u> at 796-97, 72 S. Ct. at 1006-07; <u>see</u> <u>Atkins</u>, 536 U.S. at 316, 318, 122 S. Ct. at 2249, 2250-51 (stating, "our society views mentally retarded offenders as categorically less culpable than the average criminal," and "[t]heir deficiencies do not warrant an exemption from criminal sanctions, but they do diminish their personal culpability").

And further, in <u>Ford</u>, as in <u>Atkins</u>, the Supreme Court refused to impose any particular burden of proof on the right of the insane not to be executed and left "to the State[s] the task of developing appropriate ways to enforce the constitutional

---

[15]The Supreme Court in <u>Leland</u> also stated, "We are . . . reluctant to interfere with Oregon's determination of its policy with respect to the burden of proof on the issue of sanity since we cannot say that policy violates generally accepted concepts of basic standards of justice." <u>Id.</u> at 799, 72 S. Ct. at 1007-08.

restriction upon [their] execution of sentences." 477 U.S. at 416-17, 106 S. Ct. at 2605 (plurality opinion). In <u>Ford</u>, a majority of the Supreme Court first held that the Eighth Amendment prohibited execution of insane persons. Then, in a portion of the lead opinion garnering plurality support, the Supreme Court stated that "[i]t may be that some high threshold showing on behalf of the prisoner will be found a necessary means to control the number of non-meritorious or repetitive claims of insanity." <u>Id.</u> at 417, 106 S. Ct. at 2605 (emphasis added).[16]

## C.    Hill's <u>Cooper</u> Argument

Hill relies on <u>Cooper v. Oklahoma</u>, 517 U.S. 348, 116 S. Ct. 1373 (1996), which held that an Oklahoma law that required a defendant to prove incompetence to stand trial by clear and convincing evidence violated the Due Process Clause. <u>Id.</u> at 366-69, 116 S. Ct. at 1383-84. In <u>Hill III</u>, the Georgia Supreme Court

---

[16]The plurality opinion in <u>Ford</u> discussed the procedures by which a state will determine insanity-based exclusion from execution under the Eighth Amendment:

> [W]e must conclude that the State's procedures for determining sanity are inadequate to preclude federal redetermination of the constitutional issue. We do not here suggest that only a full trial on the issue of sanity will suffice to protect the federal interests; we leave to the State the task of developing appropriate ways to enforce the constitutional restriction upon its execution of sentences. It may be that some high threshold showing on behalf of the prisoner will be found a necessary means to control the number of nonmeritorious or repetitive claims of insanity. Other legitimate pragmatic considerations may also supply the boundaries of the procedural safeguards that feasibly can be provided.

<u>Id.</u> at 416-17, 106 S. Ct. at 2605 (footnote and citation omitted). The plurality opinion noted that Florida's procedure was deficient for not furnishing the procedural safeguards of: an opportunity for the prisoner to submit evidence, an opportunity for the prisoner to impeach or challenge the opinions of the state-appointed mental health experts, and placement of factfinding authority in the hands of a neutral party. <u>Id.</u> at 413-16, 106 S. Ct. at 2603-05.

reasonably concluded that the insanity cases of <u>Leland</u> and <u>Ford</u> are more closely analogous to the burden of proof standard in Georgia's mental retardation statute than is the mental incompetency case of <u>Cooper</u>. See <u>Hill III</u>, 587 S.E.2d at 621-22.

First, <u>Cooper</u> emphasized that (1) the Supreme Court had <u>historically</u> and consistently recognized that "the <u>criminal trial</u> of an incompetent defendant violates due process"; and (2) the <u>historical</u> common law standard of proof for incompetency in both English and American cases was preponderance of the evidence. <u>Cooper</u>, 517 U.S. at 354-56, 116 S. Ct. at 1376-77 (emphasis added). In contrast, there is no historical right (in the Eighth Amendment or elsewhere) of a mentally retarded person not to be executed. And since the constitutional right itself is new, there is no historical tradition regarding the burden of proof as to that right. As recently as 1989, <u>Penry</u> refused to bar the execution of the mentally retarded. <u>Atkins</u> was based not on historical tradition or the Due Process Clause, but on the contemporary national consensus that reflected "the evolving standards of decency" that informed the meaning of <u>the Eighth Amendment</u>. <u>Atkins</u>, 536 U.S. at 311-12, 122 S. Ct. at 2247. Indeed, Georgia's reasonable doubt standard for establishing a mental retardation exception to the death penalty, which was enacted twenty-three years ago, is the oldest such law in the nation. Although

31

other states recently have employed either clear and convincing evidence or preponderance of evidence standards, no more lenient standard of proof predates Georgia's. Thus, Cooper's due process analysis does not help Hill's Eighth Amendment claims under Atkins.

## D.      Hill's Argument that Georgia's Standard Undermines Atkins

Hill argues that (1) Atkins prohibits the execution of mentally retarded persons, (2) a person who meets the preponderance of the evidence standard is more likely than not mentally retarded, and (3) thus Georgia's reasonable doubt procedural rule impermissibly burdens and effectively undermines the Eighth Amendment substantive right of the mentally retarded not to be executed.

As noted earlier, in the 219-year history of our nation's Bill of Rights, no Supreme Court decision has ever held, or even implied, that a burden of proof standard on its own can so wholly burden an Eighth Amendment right as to eviscerate or deny that right. Because there is no "clearly established" federal law supporting Hill's position, AEDPA mandates that we not overturn the Georgia Supreme Court's denial of Hill's constitutional challenge to Georgia's statutory reasonable doubt standard.[17]  See Berghuis, 130 S. Ct. at 1391-92; Haynes, 130 S.

---

[17]Two district court judges in our circuit have examined the Georgia statute in other cases and, like us, have similarly failed to see a "clearly established" right to a more lenient burden of proof in the mental retardation context. See Ledford v. Head, No. 1:02-CV-1515-JEC, 2008 WL 754486, at *3 n.6 (N.D. Ga. Mar. 19, 2008) (Carnes, J.) ("There is no language in Atkins to

Ct. at 1173.

Atkins itself does not support Hill's argument.  Atkins did not bestow a

substantive Eighth Amendment right to a fixed and rigid definition of "mentally

retarded persons."  Indeed, various states use different definitions of intellectual

functioning (some draw the line at an IQ of 75 or below, some at 70 or below,

others at 65 or below)[18] and consider different factors in assessing adaptive

suggest that Georgia's standard is constitutionally impermissible.  In fact, the Supreme Court
cited Georgia's statute with approval."); Ferrell v. Head, 398 F. Supp. 2d 1273, 1295 (N.D. Ga.
2005) (Thrash, J.) ("Atkins makes it abundantly clear that each state is permitted to design its
own system for determining mental retardation, insofar as such system does not wholly erode the
constitutional prohibition against execution of the mentally retarded.  The Petitioner fails to
persuade this Court that Georgia's statute so erodes this prohibition."), rev'd in part on other
grounds by Ferrell v. Hall, 640 F.3d 1199 (11th Cir. 2011).

[18]See, e.g., Ariz. Rev. Stat. Ann. § 13-753 (establishing procedure by which defendants in
capital cases are pre-screened by psychological expert who administers IQ test; those with scores
below 76 are tested further by mental retardation experts, and if the defendant then scores 70 or
below on any IQ test, the court conducts a hearing at which the defendant must prove mental
retardation by clear and convincing evidence; a "determination by the trial court that the
defendant's intelligence quotient is sixty-five or lower establishes a rebuttable presumption that
the defendant has mental retardation," but "a defendant with an intelligence quotient of seventy
or below" can still prove mental retardation by the clear and convincing evidence standard),
amended by 2011 Ariz. Legis. Serv. 89 (West) (replacing term "mental retardation" with "an
intellectual disability"); Ark. Code Ann. § 5-4-618(a)(2) ("There is a rebuttable presumption of
mental retardation when a defendant has an intelligence quotient of sixty-five (65) or below.");
725 Ill. Comp. Stat. § 5/114-15(d) (2010) ("An intelligence quotient (IQ) of 75 or below is
presumptive evidence of mental retardation."), amended by 2011 Ill. Legis. Serv. 97-227
(replacing terms "mentally retarded" and "mental retardation" with "intellectually disabled" and
"an intellectual disability"); Ky. Rev. Stat. Ann. § 532.130 ("'Significantly subaverage general
intellectual functioning' is defined as an intelligence quotient (I.Q.) of seventy (70) or below.");
Neb. Rev. Stat. § 28-105.01(3) ("An intelligence quotient of seventy or below on a reliably
administered intelligence quotient test shall be presumptive evidence of mental retardation.");
S.D. Codified Laws § 23A-27A-26.2 ("An intelligence quotient exceeding seventy on a reliable
standardized measure of intelligence is presumptive evidence that the defendant does not have
significant subaverage general intellectual functioning."); Wiley v. Epps, 668 F. Supp. 2d 848,
897 (N.D. Miss. 2009) ("In Mississippi, [an] IQ of 75 is the 'cutoff score' for assessing

functioning. <u>Atkins</u> itself acknowledged that the states' "statutory definitions of mental retardation are not identical," though they "generally conform to the clinical definitions" set forth by the APA and AAMR. <u>Atkins</u>, 536 U.S. at 317 n.22, 122 S. Ct. at 2250 n.22.

It is undisputed that Georgia's statutory definition of mental retardation is consistent with the clinical definitions cited in <u>Atkins</u>. <u>Compare</u> O.C.G.A. § 17-7-131(a)(3), <u>with</u> <u>Atkins</u>, 536 U.S. at 308 n.3, 122 S. Ct. at 2245 n.3. Thus, contrary to the dissents' contentions, this is not a case about the categorical exclusion of the mildly mentally retarded or any other group from the <u>Atkins</u> prohibition. Instead, it is about Georgia's <u>procedure</u> for determining who is mentally retarded, which is a matter distinct from the Eighth Amendment issue decided in <u>Atkins</u>. <u>See</u> <u>Atkins</u>, 536 U.S. at 317, 122 S. Ct. at 2250; <u>cf.</u> <u>Walker v. True</u>, 399 F.3d 315, 319 (4th Cir. 2005) ("While Walker's claim ultimately derives from his rights under the Eighth Amendment, whether he is mentally retarded is governed by Virginia law."). To argue otherwise is to argue that federal courts, not the states, have the responsibility under <u>Atkins</u> for promulgating the procedures that will be used to determine mental retardation.

In any event, because <u>Atkins</u> never said, or even hinted at (much less held),

---

subaverage intellectual functioning for purposes of diagnosing mental retardation.").

34

what procedures are or are not "appropriate" for implementing the prohibition Atkins recognized, Atkins cannot possibly provide "clearly established" federal law for Hill's claims. To accept Hill's argument would require us not only to abandon the deference AEDPA demands, but also to ignore the clear language of Atkins itself about who is to decide what procedures are to be used to determine mental retardation.[19]

Additionally, Hill focuses on Georgia's burden of proof procedure and ignores the many other procedural protections afforded under Georgia's statute and processes. Looking solely to one aspect of Georgia's procedures, without placing them in context, is inconsistent with Ford, where the Supreme Court evaluated Florida's process as a whole.[20]

─────────────────

[19]We do not hold, as one dissent charges, "that states have complete discretion to choose any procedures to govern the determination of mental retardation." Infra, at 72 (Dissenting opinion of Barkett, J.). We decide only the issue before us, which concerns only the standard of proof, and we hold only that the Georgia Supreme Court's decision in Hill III was not contrary to, and did not involve an unreasonable application of, Atkins.

[20]Florida law directed the Governor to appoint a commission of three psychiatrists to simultaneously examine the defendant and then to provide an ex parte report to the Governor. The Supreme Court found that Florida's process suffered from a number of grievous flaws: (1) defendants were not included at all in the "truth-seeking process"; (2) defendants were prohibited from submitting material to the factfinder; (3) there was no opportunity for the defendant to challenge or impeach state-appointed experts; (4) the psychiatric examination of defendant Ford was only 30 minutes long; and (5) the insanity evaluation process was housed exclusively within the province of the executive branch, which gave the Governor the final say over fact findings needed to trigger the constitutional protection. See Ford, 477 U.S. at 416, 106 S. Ct. at 2605 ("In no other circumstance of which we are aware is the vindication of a constitutional right entrusted to the unreviewable discretion of an administrative tribunal.") (plurality opinion).

Georgia's process, when evaluated as a whole, contains substantial

procedural protections.[21] The Georgia statute allows a defendant to raise the issue

of mental retardation in the guilt phase of his criminal trial and permits a jury to

find a defendant guilty but mentally retarded. O.C.G.A. § 17-7-131(c)(3). This

has two significant advantages. The jury does not hear the criminal history that is

allowed in the penalty phase, and it is not informed that a guilty but mentally

retarded verdict will preclude the death penalty. See King v. State, 539 S.E.2d

783, 798 (Ga. 2000) ("[A] jury should not be informed that a finding of mental

retardation bars the imposition of the death penalty."); Heidler v. State, 537 S.E.2d

44, 55 (Ga. 2000) ("[I]n the guilt-innocence phase, the trial court should not inform

the jury that the defendant will not receive a death sentence if he is found guilty but

mentally retarded.").

Georgia law also guarantees Hill the right: (1) not to be sentenced to death

except by unanimous verdict, with no judicial override possible; (2) to a full and

fair plenary trial on his mental retardation claim, as part of the guilt phase of his

---

[21]If anything, Georgia's procedural protections go above and beyond the protections required by Ford. For starters, the plurality opinion in Ford made clear that it did not "suggest that only a full trial on the issue of sanity will suffice to protect the federal interests." Id. Here, Georgia provides for a full trial on the issue of mental retardation. Furthermore, Justice Powell's decision to join the four-vote plurality in Ford was based not on plucking out one piece of Florida's procedure, but rather on his assessment that, considered collectively, "the procedures followed by Florida in this case do not comport with basic fairness." Id. at 399, 106 S. Ct. at 2609 (emphasis added).

capital trial; (3) to present his own experts and all other relevant evidence; (4) to cross-examine and impeach the State's experts and other witnesses; (5) to have a neutral factfinder (the jury, if Hill had elected to have mental retardation decided during the guilt phase, and a judge if otherwise) decide the issue; (6) to question prospective jurors about their biases related to mental retardation; (7) to have jurors decide mental retardation without being informed that a finding of mental retardation precludes the death penalty and without being informed of the defendant's criminal record; (8) to orally argue before the factfinder; and (9) to appeal any adverse mental retardation determination. Within the bounds of evidentiary admissibility, there is virtually no limit to the evidence a Georgia defendant can present in support of his mental retardation claim. Thus, the reasonable doubt standard is but one aspect of a multifaceted fact-finding process under Georgia law. This is not to say what the ultimate outcome of the constitutional issue may or should be in future non-AEDPA cases, but only illustrates further how Hill's challenge to the burden of proof standard should not be viewed in isolation.[22]

---

[22]Hill asks this Court to review the burden of proof standard in isolation. However, we should not ignore the full range of rights available to a capital defendant claiming mental retardation under O.C.G.A. § 17-7-131 merely because Hill — by raising his mental retardation claim not as part of his criminal trial as the statute contemplates, but only later in his state habeas case — did not take advantage of all the rights available to him.

As did the Atkins Court, Justice Powell's concurring opinion in Ford made clear the refusal to clearly establish any precise limit on a state's fact-finding procedures for determining the insanity bar to execution, aside from a few core due process rights. See Ford, 477 U.S. at 427, 106 S. Ct. at 2610 (Powell, J., concurring in part and concurring in the judgment) ("The State should provide an impartial officer or board that can receive evidence and argument from the prisoner's counsel, including expert psychiatric evidence that may differ from the State's own psychiatric examination. Beyond these basic requirements, the States should have substantial leeway to determine what process best balances the various interests at stake." (emphasis added)).

The Supreme Court in Atkins, as in Ford, announced an Eighth Amendment prohibition on executions in specified circumstances but never purported to decide or prescribe how states should procedurally implement that prohibition. Atkins left the states substantial leeway in enacting procedures to determine whether a capital defendant is exempt from execution because he is mentally retarded. And Georgia has exercised that leeway by setting the IQ level at 70, by affording a capital defendant the multiple and significant rights outlined above, and by determining that the risk of error due to malingering or other factors is substantial and that there is a need for a robust burden of proof. This potential for malingering is evidenced

in this case (1) where Hill's initial expert (clinical psychologist William Dickinson) initially testified Hill had an IQ of 77 and was not mentally retarded, and (2) even though Georgia provided a mental retardation bar to execution since 1988, Hill never claimed mental retardation at trial, on direct appeal, or in his first state habeas petition. In fact, the state habeas record documents Hill's (1) extensive work history and ability to function well; (2) disciplined savings plans to purchase cars and motorcycles; (3) military service; and (4) active social life. This is not to diminish the critical importance of the <u>Atkins</u> right not to be executed if mentally retarded. It is <u>only</u> to say that the Georgia Supreme Court's decision was not contrary to "clearly established" federal law and for that reason AEDPA bars our reversing it.

## E. Hill's Risk of Error Argument

Hill argues that Georgia's burden of proof statute will inevitably result in the execution of some mentally retarded defendants because they might be able to prove they are mentally retarded by a preponderance of the evidence but not beyond a reasonable doubt. From this Hill extrapolates that the beyond a reasonable doubt standard is contrary to <u>Atkins</u> because it will result in the execution of some offenders who are mentally retarded but cannot prove it beyond a reasonable doubt. There are fundamental flaws in Hill's argument.

39

First, Hill's risk of error argument, like his other claims, ignores the fact that Atkins disavowed any intent to establish a nationwide procedural or substantive standard for determining mental retardation.  See Atkins, 536 U.S. at 317, 122 S. Ct. at 2250; Bies, 129 S. Ct. at 2150.  Notably too, Hill isolates Georgia's burden of proof standard and ignores all of the many other procedures in Georgia law favorable to a defendant, as outlined above, that assist a jury in accurately determining whether a defendant is mentally retarded.

Second, Hill's risk of error inquiry asks and answers the wrong question. Instead of asking whether the decision of the Georgia Supreme Court was contrary to clearly established federal law as determined by the Supreme Court, it asks whether, under de novo review, the Georgia procedural requirement goes as far as it could to enforce the substantive constitutional prohibition the Supreme Court announced in Atkins.  Because the Supreme Court has never considered that question, or even a similar one, it is necessarily a matter of first impression.  Such de novo inquiry is precisely what a federal habeas court cannot, and should not, do. A federal court may not grant habeas relief on a claim a state court has rejected on the merits simply because the state court held a view different from its own.  See Mitchell v. Esparza, 540 U.S. 12, 17, 124 S. Ct. 7, 11 (2003).

A third critical flaw in Hill's argument is that a risk of error exists with any

40

burden of proof. Every standard of proof allocates some risk of an erroneous factual determination to the defendant and therefore presents some risk that mentally retarded offenders will be executed in violation of <u>Atkins</u>. The adjudication of all facts always involves a "margin of error . . . which both parties must take into account." <u>In re Winship</u>, 397 U.S. 358, 364, 90 S. Ct. 1068, 1072 (1970) (quotation marks omitted). In any proceeding to determine whether a defendant is mentally retarded, and no matter what the burden of proof, "the trier of fact will sometimes, despite his best efforts, be wrong in his factual conclusions." <u>Id.</u> at 370, 90 S. Ct. at 1076 (Harlan, J., concurring).

Two kinds of fact determination risks are possible when an offender alleges that he is mentally retarded. <u>See id.</u> at 370–71, 90 S. Ct. at 1076. The first is that the trier of fact will conclude that the offender is mentally retarded when, in fact, he is not. The second is that the trier of fact will conclude that the offender is not mentally retarded when, in fact, he is.

Although the preponderance of the evidence standard may present a smaller risk of the latter kind of error, even under that standard there is a risk that the trier of fact will erroneously conclude that an offender is not mentally retarded when, in fact, he is. Consequently, under Hill's reasoning, even a preponderance of the evidence standard will result in the execution of those offenders that <u>Atkins</u> was

designed to protect because it does not eliminate the risk that the trier of fact will conclude that the offender is not mentally retarded when, in fact, he is. It only decreases the risk of that kind of erroneous conclusion. That necessarily would mean that those 28 states that require the defendant to prove mental retardation either by clear and convincing evidence (Arizona, Colorado, Delaware, Florida, and North Carolina) or by a preponderance of the evidence standard (23 states) have violated the Eighth Amendment because there will always be some risk of error in those two standards. The necessary result of Hill's reasoning is that the burden of proof must be placed on the state and that the state must prove beyond any doubt that an offender is not mentally retarded. No state uses that standard. The effective result of Hill's argument, then, is that every state's death penalty statute or case law procedure is unconstitutional because none of them requires the state to prove the absence of mental retardation beyond a reasonable doubt. Or, to take Hill's argument to its logical conclusion, beyond all doubt.

Indeed, under the reasoning Hill employs, virtually any state rule that allocates to the defendant at least some risk that the trier of fact will erroneously conclude that he is not mentally retarded would be insufficient to enforce the constitutional prohibition of Atkins. All kinds of rules serve to allocate the risk of an erroneous decision—procedural rules that determine who can participate in the

42

presentation of evidence and argument, evidentiary rules that determine what evidence the trier of fact can consider, and decisional rules like the standard of proof at issue here. See Alex Stein, Constitutional Evidence Law, 61 Vand. L. Rev. 65, 67–68 (2008). Taken literally, the logic on which Hill relies would invalidate any rule that allocates to the defendant some risk of an erroneous conclusion about a defendant's mental retardation. Cf. Patterson v. New York, 432 U.S. 197, 208, 97 S. Ct. 2319, 2326 (1977) ("Punishment of those found guilty by a jury . . . is not forbidden merely because there is a remote possibility in some instances that an innocent person might go to jail.").

And there is no reason to limit the insistence that all risk of error be borne by the state just to mental retardation cases. If Hill's no-risk reasoning is accepted, it would give rise to similar claims about determining insanity and competency to be executed. After all, unless the state is required to rule out those two mental conditions beyond all doubt, there will be, as Hill's argument goes, some who are convicted and punished, even executed, although they were insane at the time of the crime, see Leland, 343 U.S. at 790, 72 S. Ct. at 1002, or were mentally incompetent at the time of the execution, see Ford, 477 U.S. at 399, 106 S. Ct. at 2595. There is no end to the position that Hill espouses.

Fourth, there is no evidence in this record to support the proposition that the

reasonable doubt standard triggers an unacceptably high error rate for mental retardation claims. Whether a burden of proof scheme will result in an unacceptably high error rate is, in part, an empirical question that we are ill-equipped to measure in the first instance. <u>There is no data on this question in this record.</u>

**F.    Dissent's Reported Cases**

In an effort to circumvent this lack of any evidence on the error rate, one dissent cites 22 reported capital cases in Georgia where mental retardation claims were raised. <u>Infra</u>, at 89-91 (Dissenting opinion of Barkett, J.) The dissent argues that out of those cases, "<u>only one</u> defendant has ever successfully established his mental retardation beyond a reasonable doubt." <u>Id.</u> at 90. The dissent argues that this "confirms just how extraordinarily difficult it is for an offender to meet the beyond a reasonable doubt standard." <u>Id.</u> at 89. Those purported statistics and that reasoning are faulty for multiple reasons.

First, the 22 case statistics. We note that: (1) in 5 of the 22 cases cited by the dissent, the defendant received a life sentence, not a death sentence, <u>see</u> <u>Foster v. State</u>, 283 Ga. 47, 656 S.E.2d 838 (2008); <u>Torres v. State</u>, 272 Ga. 389, 529 S.E.2d 883 (2000); <u>Lyons v. State</u>, 271 Ga. 639, 522 S.E.2d 225 (1999); <u>Mosher v. State</u>, 268 Ga. 555, 491 S.E.2d 348 (1997); <u>Williams v. State</u>, 262 Ga. 732, 426

S.E.2d 348 (1993); (2) in one of the cases, <u>Heidler v. State</u>, the defendant admitted at trial that he introduced no evidence he was mentally retarded and told the jury it had nothing to consider as to mental retardation, 273 Ga. 54, 63, 537 S.E.2d 44, 55 (2000); (3) in another of the cases, <u>Foster v. State</u>, the defendant's conviction was reversed because the trial court failed to charge the jury on the statutory definition of mental retardation, 283 Ga. 47, 49-50, 656 S.E.2d 838, 841 (2008); (4) in another of the cases, <u>Head v. Stripling</u>, the Georgia Supreme Court affirmed the state habeas court's order granting habeas relief and ordering a retrial on mental retardation because the State suppressed evidence favorable to the defendant's mental retardation claim, 277 Ga. 403, 407-10, 590 S.E.2d 122, 126-28 (2003); and (5) in two of the cases, <u>Morrison v. State</u>, 276 Ga. 829, 830, 583 S.E.2d 873, 875 (2003), and <u>Rogers v. State</u>, 282 Ga. 659, 659, 653 S.E.2d 31, 34 (2007), the defendants were granted a trial on mental retardation <u>under a preponderance standard</u>, which they failed to meet. That leaves only 13 reported mental retardation capital cases (including Hill's) from 1988 to 2011.

Second, the dissent's focus on only reported appellate decisions skews its analysis. The dissent overlooks the fact that in Georgia mental retardation is tried <u>in the guilt phase</u> of capital cases, not the penalty phase. When a Georgia capital defendant is found guilty but mentally retarded, he automatically obtains a life

45

sentence and (1) may not appeal at all, or (2) may appeal as to issues that do not require discussion of the mental retardation issue, which was decided in his favor. Also unreflected in the dissent's data are cases where a defendant offers evidence of mental retardation, but also proves he is innocent of the crime, thereby obtaining a verdict of not guilty (instead of guilty but mentally retarded), precluding any appeal. And, of course, defendants who have substantial evidence of mental retardation may plead guilty but mentally retarded, with the State's acquiescence, and not appear in the reported appellate decisions for that reason. The dissent's listing of 13 reported cases where a death sentence was imposed far from captures the universe of mental retardation issue cases. That Georgia has had the mental retardation bar for 23 years and the dissent can cite only 13 reported cases of a defendant not prevailing, if anything, suggests just the opposite of the dissent's proposition.

Third, the dissent proffers no evidence that the defendants in those 13 reported cases actually are mentally retarded, or would be found to be mentally retarded under a preponderance of the evidence standard. There is no evidence at all of that.

Fourth, even if one were to consider the dissent's skewed data, the fact remains that reported cases in Georgia actually show that judges and juries do find

46

defendants guilty but mentally retarded under Georgia's proof beyond a reasonable doubt standard. See, e.g., Hall v. Lewis, 286 Ga. 767, 692 S.E.2d 580 (2010) (defendant convicted of murder and sentenced to death; trial court in state habeas held defendant had proven his mental retardation beyond a reasonable doubt and found trial counsel ineffective for not investigating and presenting evidence of defendant's mental retardation at guilt/innocence phase); Walker v. State, 282 Ga. 774, 782, 653 S.E.2d 439, 447 (2007), abrogated on other grounds by Ledford v. State, 289 Ga. 70, 85, 709 S.E.2d 239, 254, cert. denied, — U.S. —, — S. Ct. —, 2011 WL 4344614 (Nov. 7, 2011) (defendant convicted and sentenced to death, but in doing proportionality review, the Georgia Supreme Court's opinion stated that defendant's co-defendant Griffin was sentenced to life and "has been adjudicated mentally retarded, making him ineligible for a death sentence"); Marshall v. State, 276 Ga. 854, 583 S.E.2d 884 (2003) (defendant charged with malice murder but convicted of felony murder and involuntary manslaughter; jury found defendant guilty but mentally retarded as to felony murder and involuntary manslaughter); Chauncey v. State, 283 Ga. App. 217, 641 S.E.2d 229 (2007) (after bench trial, judge found defendant guilty but mentally retarded on eight charges of aggravated child molestation and aggravated sodomy); Laster v. State, 234 Ga. App. 16, 505 S.E.2d 560 (1998) (jury found defendant guilty but mentally retarded

47

on charge of first-degree arson); <u>Moody v. State</u>, 205 Ga. App. 376, 422 S.E.2d 70 (1992) (jury found defendant guilty but mentally retarded on charges of child molestation and aggravated child molestation).  All of those cases are examples of defendants being found mentally retarded under the proof beyond a reasonable doubt standard the dissent implies precludes such a finding.

## G.    The Dissents and Procedural Due Process

Because the United States Supreme Court has never stated, in <u>Atkins</u> or elsewhere, that a reasonable doubt standard for mental retardation violates the Eighth Amendment, the dissents attempt to avoid this pivotal fact by making what are, in effect, procedural due process arguments.  The primary dissent argues that Georgia's burden of proof procedure, in practical operation, eviscerates the substantive Eighth Amendment right under <u>Atkins</u>.  <u>Infra</u>, at 76 (Dissenting opinion of Barkett, J.).  The dissent states that "the question before the Supreme Court of Georgia was whether Georgia's burden of proof eviscerates the substantive constitutional right of the mentally retarded not to be executed" under <u>Atkins</u>.  <u>Id</u>.  In this regard, the dissent argues that: (1) "Georgia . . . cannot indirectly authorize the execution of mentally retarded offenders through a procedure that in practical operation accomplishes that result"; and thus (2) the Georgia Supreme Court's approval of the beyond a reasonable doubt standard for

48

mental retardation claims is contrary to clearly established federal law, as announced by the Supreme Court in Bailey v. Alabama, 219 U.S. 219, 31 S. Ct. 145 (1911), and Speiser v. Randall, 357 U.S. 513, 78 S. Ct. 1332 (1958). Infra, at 76, 92 (Dissenting opinion of Barkett, J.).

Although this en banc case and the Georgia Supreme Court decision under scrutiny are about the Eighth Amendment, the separate procedural due process provenance of this dissent's argument is evident from the Bailey and Speiser cases upon which it relies. Neither Bailey nor Speiser are Eighth Amendment cases (or capital cases, or mental retardation cases). Bailey concerned a Thirteenth Amendment challenge to a state statute criminalizing the breach of a personal service contract. Bailey, 219 U.S. at 227, 245, 31 S. Ct. at 146, 153. Speiser resolved a First Amendment and Fourteenth Amendment challenge to a state tax exemption scheme that required applicants to prove they did not advocate the overthrow of the government. Speiser, 357 U.S. at 514-17, 78 S. Ct. at 1336-37. The Speiser Court stated specifically that "[t]he question for decision . . . is whether [the state's] allocation of the burden of proof, on an issue concerning freedom of speech, falls short of the requirements of due process." Id. at 523, 78 S. Ct. at 1341.[23]

---

[23]Although Bailey did not expressly rely on due process grounds in finding a constitutional violation, its focus on state procedural rules and its subsequent use by the Supreme

But the wholly separate issue of procedural due process under the Due Process Clause, however formulated, is not in the case before us. Rather, this case is about Hill's <u>substantive</u> constitutional right under the Eighth Amendment. It is telling that the parties never mentioned either <u>Bailey</u> or <u>Speiser</u> in their briefs to the Georgia Supreme Court.

By attempting to transpose the holdings of <u>Bailey</u> (a Thirteenth Amendment case) and <u>Speiser</u> (a First Amendment case) into the Eighth Amendment context, the dissent makes the same error the Supreme Court identified in <u>Moore</u>. In <u>Moore</u>, as discussed above, the Supreme Court reversed a court of appeals' decision—that a state court unreasonably applied the <u>Strickland</u> ineffective assistance of counsel standard—that relied on a case, <u>Arizona v. Fulminante</u>, 499 U.S. 279, 111 S. Ct. 1246 (1991), which did not involve ineffective assistance of counsel. See <u>Premo v. Moore</u>, 131 S. Ct. at 737-39, 743. The Supreme Court stated that the court of appeals, to reach its conclusion that the state court decision was an unreasonable application of <u>Strickland</u>, "transposed [<u>Fulminante</u>] into a novel context; and novelty alone—at least insofar as it renders the relevant rule

Court suggest a due process analysis. See <u>Speiser</u>, 357 U.S. at 526, 78 S. Ct. at 1342 (relying on <u>Bailey</u> as part of its analysis finding a due-process-based First Amendment infringement); <u>see also</u> <u>Heiner v. Donnan</u>, 285 U.S. 312, 329, 52 S. Ct. 358, 362 (1932) (quoting <u>Bailey</u>'s pronouncement "that a constitutional prohibition cannot be transgressed indirectly by the creation of a statutory presumption" in context of due process discussion). But even if <u>Bailey</u> is read as relying not on due process but only the Thirteenth Amendment, it undisputedly is not an Eighth Amendment case.

less than 'clearly established'—provides a reason to reject it under AEDPA." Id. at 743. The Georgia Supreme Court's decision in Hill III, like the state court decision discussed in Moore, was not "contrary to," and did not "involve[] an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States." 28 U.S.C. § 2254(d)(1) (emphasis added).

## H.    Panetti and Procedural Due Process

The two other dissents in this case, (Dissenting opinions of Wilson, J., and Martin, J.), rely primarily on Panetti v. Quarterman, 551 U.S. 930, 127 S. Ct. 2842 (2007), which addressed the petitioner's (1) incompetence-to-be-executed claim and (2) his argument that the state court failed to provide the minimum procedural due process requirements of Ford v. Wainwright, 477 U.S. 399, 106 S. Ct. 2595 (1986). Panetti, 551 U.S. at 948, 127 S. Ct. at 2855.

Panetti (1) does not involve Atkins or mental retardation, (2) does not discuss burdens of proof, and (3) was issued four years after the Georgia Supreme Court's decision in Hill III. Each factor alone, and certainly collectively, is sufficient to demonstrate Panetti's inadequacy for showing that the Georgia Supreme Court's decision in Hill III is contrary to, or an unreasonable application of, clearly established federal law.

But there is something more. Panetti, if anything, shows why Hill's claim

fails here. Panetti relied on the prior decision of Ford, which had announced both a substantive Eighth Amendment right and a specific procedural due process requirement under the Due Process Clause for incompetency claims: the petitioner must have an opportunity to present evidence and argument. See Ford, 477 U.S. at 424-25, 106 S. Ct. at 2609 (concurring opinion of Powell, J.) (stating that "the question in this case is whether Florida's procedures for determining petitioner's sanity comport with the requirements of due process," finding Florida's procedures do not require the factfinder to consider the petitioner's materials, and concluding they thus deprive the prisoner of an "opportunity to be heard"); see also Panetti, 551 U.S. at 948-49, 127 S. Ct. at 2855-56 (noting Ford "identifies the measures a State must provide when a prisoner alleges incompetency to be executed," "sets the minimum procedures a State must provide to a prisoner raising a Ford-based competency claim," and "constitutes 'clearly established' law for purposes of § 2254").

As to the minimum procedures for incompetence-to-be-executed claims, Ford announced that the "basic [procedural] requirements" include an opportunity to submit "evidence and argument from the prisoner's counsel, including expert psychiatric evidence that may differ from the State's own psychiatric examination." Ford, 477 U.S. at 427, 106 S. Ct. at 2610 (concurring opinion of

Powell, J.).  In Panetti, the state court appointed its own experts but did not give petitioner Panetti an "opportunity to submit expert evidence in response to the report filed by the court-appointed experts," an error "that Ford makes clear is impermissible under the Constitution."  Panetti, 551 U.S. at 950-51, 127 S. Ct. at 2857.  The state court's adjudication in Panetti thus violated the specific legal procedure required by Ford.[24]

Panetti is a straightforward application of AEDPA.  The Court in Panetti concluded that: (1) Supreme Court precedent in Ford clearly established not only the substantive Eighth Amendment right not to be executed if incompetent but also certain minimum procedural due process guidelines under the Due Process Clause for bringing the substantive claim, and (2) the state court procedures afforded Panetti did not satisfy Ford's procedural requirement of an opportunity to present expert evidence.  Here, by contrast, Atkins established only a substantive Eighth Amendment right for the mentally retarded, not any minimum procedural due process requirements for bringing that Eighth Amendment claim.  Importantly too, Panetti does not mention the burden of proof at all and thus did not establish

---

[24]When the Supreme Court in Panetti noted (1) that the state court's decision rested on the implicit finding that the procedures provided were adequate, (2) that "this determination cannot be reconciled with any reasonable application of the controlling standard in Ford," and (3) "[t]hat the standard is stated in general terms does not mean the application was reasonable," 551 U.S. at 952-53, 127 S. Ct. at 2858, the "standard" to which the Court was referring was Ford's procedural due process standard, not its substantive Eighth Amendment standard.

53

federal law as to the burden of proof.  Thus, the Georgia Supreme Court's decision about the burden of proof cannot be contrary to, or an unreasonable application of, the controlling Supreme Court precedent in <u>Atkins</u>, or <u>Panetti</u> for that matter. AEDPA does not permit us, as the dissents' approach would have us do, to import a procedural burden of proof requirement into <u>Atkins</u> (that expressly declined to adopt one) from <u>Panetti</u> (that did not mention the burden of proof), and then find that a state's preexisting procedural standards are an unreasonable application of that imported standard.

## IV.  CONCLUSION

Even if the State of Georgia has somehow inappropriately struck the balance between two competing interests in § 17-7-131(c)(3), and even if the Georgia Supreme Court's decision upholding that statute is considered incorrect or unwise by a federal court, AEDPA precludes a federal court from imposing its will, invalidating that state statute as unconstitutional, and granting federal habeas relief in the absence of "clearly established" federal law, which the United States Supreme Court admonishes is <u>a holding of that Court</u>.  There is no United States Supreme Court case holding that a reasonable doubt burden of proof for claims of mental retardation violates the Eighth Amendment.  <u>Atkins</u> did not ask or answer that question.

Whether we agree with the Georgia Supreme Court or not, AEDPA requires us to affirm the denial of Hill's § 2254 petition. We do not decide whether Georgia's burden of proof is constitutionally permissible, but only that no decision of the United States Supreme Court clearly establishes that it is unconstitutional. Simply put, Hill has failed to show "that no fairminded jurist could agree" with the Georgia Supreme Court's decision about the burden of proof, and thus this Court is "without authority to overturn the reasoned judgment of the State's highest court." Dixon, slip op. at 1, 10.

If the standard of proof Georgia has adopted for claims of mental retardation is to be declared unconstitutional, it must be done by the Supreme Court in a direct appeal, in an appeal from the decision of a state habeas court, or in an original habeas proceeding filed in the Supreme Court, see Felker v. Turpin, 518 U.S. 651, 662–63, 116 S. Ct. 2333, 2339 (1996) (leaving open the question whether AEDPA's restrictions apply to federal habeas proceedings that originate in the Supreme Court). AEDPA prohibits this Court from doing it here.

**AFFIRMED.**

TJOFLAT, Circuit Judge, specially concurring:

I concur only in the court's judgment. I cannot quibble with the court's finding that Supreme Court precedent does not prevent the State of Georgia from applying a beyond-a-reasonable-doubt standard to Hill's claim that he is mentally retarded. However, I do not believe we ought to reach this conclusion for two reasons. First, burdens of proof are procedural rules and are governed by laws pertaining to procedural due process. Second, Hill raised his mental retardation claim—and the associated claim regarding the beyond-a-reasonable-doubt standard—in a state post-conviction proceeding, as opposed to during his criminal trial. These two points combine to form Hill's true claim: that he deserves habeas relief because the State violated his procedural due process rights during a post-conviction proceeding. Such claims do not form the basis of habeas relief, and I would affirm the district court's judgment on that ground.

Georgia law provides that defendants accused of murder may avoid the death penalty if they prove that they are mentally retarded beyond a reasonable doubt. O.C.G.A. § 17-7-131(c)(3). Hill could have raised this defense during the guilt phase of his 1991 criminal trial; for some reason, he did not. Turpin v. Hill, 498 S.E.2d 52, 52 (Ga. 1998). The Georgia courts forgave this obvious procedural default and permitted Hill to argue his mental-retardation defense in a post-

56

conviction proceeding.  Id. at 53.  The Georgia courts did not vacate Hill's

sentence and, in effect, re-open his criminal trial.  The Georgia Supreme Court

rejected the post-conviction trial court's initial decision to issue a limited writ of

habeas corpus and hold a jury trial on the mental-retardation defense, which would

have presumably re-opened his conviction for this limited proceeding.  Id. at

53–54.  Rather, the court permitted Hill to raise the issue without a jury during the

post-conviction proceeding.  Id.  It was during that proceeding that Hill argued that

Georgia's beyond-a-reasonable-doubt standard conflicted with the Supreme

Court's decision in Atkins v. Virginia, 536 U.S. 304, 122 S. Ct. 2242, 153 L. Ed.

2d 335 (2002).[1]  Head v. Hill, 587 S.E.2d 613, 618, 620–22 (Ga. 2003).

The court and I part ways at the starting point of its analysis.  The court

accepts and responds to Hill's argument as he presents it—that Georgia's beyond-

a-reasonable-doubt standard somehow violates the rule laid out in Atkins that the

Eighth Amendment prohibits the execution of the mentally retarded.  But Hill's

real argument, framed properly, is not an Eighth Amendment argument; it is that

---

[1] Note that, at the time of Hill's 1991 criminal trial, the Eighth Amendment did not
prohibit the execution of the mentally retarded.  Compare Penry v. Lynaugh, 492 U.S. 302, 335,
109 S. Ct. 2934, 2955, 106 L. Ed. 2d 256 (1989) (finding that the Eighth Amendment did not
prohibit executions of mentally-retarded defendants), with Atkins v. Virginia, 536 U.S. 304, 122
S. Ct. 2242, 153 L. Ed. 2d 335 (2002) (finding that the Eight Amendment prohibits such
executions).  Georgia's standard, enacted in 1988, was written not as a way to enforce federal
law, but rather as an expression of the State's independent judgment that it ought not execute the
mentally retarded.

the beyond-a-reasonable-doubt standard denies him due process of law.

Burdens of proof are procedural rules governed by norms of procedural due process. See Medina v. California, 505 U.S. 437, 446–48, 112 S. Ct. 2572, 2577–78, 120 L. Ed. 2d 353 (1992) (deciding whether shifting the burden of proof to the defendant to demonstrate that he is incompetent to stand trial violates a defendant's due process rights); Sandstorm v. Montana, 442 U.S. 510, 520, 99 S. Ct. 2450, 2457, 61 L. Ed. 2d 39 (1979) ("[W]e explicitly hold that the Due Process Clause protects the accused against conviction except upon proof beyond a reasonable doubt . . . ." (quoting In re Winship, 397 U.S. 358, 364, 90 S. Ct. 1068, 1073, 25 L. Ed. 2d 368 (1970))). The Eighth Amendment inquiry in Atkins, in contrast, had nothing to do with due process. The Court's holding was based solely on the "evolving standards of decency" inquiry into whether executing the mentally retarded was excessive punishment. Atkins, 536 U.S. at 311–12, 122 S. Ct. at 2247. So, by challenging the beyond-a-reasonable-doubt standard, Hill's claim is not properly an Eighth Amendment claim, but one cognizable under due process. As such, Hill's real complaint is not that he is mentally retarded, and that the state post-conviction court's contrary conclusion was erroneous. Hill instead argues that the state post-conviction proceeding utilized an unfair procedure for determining whether he is mentally retarded.

With Hill's argument framed in this way, the forum in which Hill made his argument is of paramount importance. We would of course address his due process claim if the allegedly foul process occurred during his criminal trial. E.g., Wright v. Sec'y for Dep't of Corr., 278 F.3d 1245, 1256 (11th Cir. 2002) (addressing, under 28 U.S.C. § 2254, the petitioner's claim that the state trial court violated his procedural due process rights because he was incompetent to stand trial). If Hill had raised his mental-retardation defense at trial, and raised this challenge to the beyond-a-reasonable-doubt standard there, he could claim that his conviction and sentence were tainted by a violation of his due process rights.[2]

Due process violations during state post-conviction proceedings do not, however, form the basis of habeas relief. Carroll v. Sec'y, Dep't of Corr., 574 F.3d 1354, 1365 (11th Cir. 2009); Quince v. Crosby, 360 F.3d 1259, 1262 (11th Cir. 2004). The habeas statute permits federal courts to grant habeas relief to state prisoners on the ground that they are "in custody pursuant to the judgment of a State court" in violation of federal law. 28 U.S.C. § 2254(a). State post-conviction proceedings are not the "judgment" that resulted in the prisoner's detention. See Carroll, 574 F.3d at 1365 ("[A] challenge to a state collateral proceeding does not

_____

[2] This statement assumes that Hill's criminal trial occurred after the Supreme Court decided Atkins. If Hill had raised his mental-retardation defense in during his 1991 trial, he would not have been able to argue that the beyond-a-reasonable-doubt standard conflicted with Atkins, for Atkins did not yet exist.

undermine the legality of the detention or imprisonment- i.e., the conviction itself .

. . .").  Post-conviction proceedings are instead "civil in nature and are not part of

the criminal proceeding itself."  Pennsylvania v. Finley, 481 U.S. 551, 556–57, 107

S. Ct. 1990, 1994, 95 L. Ed. 2d 539 (1987).

Therefore, procedural violations during state post-conviction proceedings

are "issues unrelated to the cause of the petitioner's detention."  Spradley v.

Dugger, 825 F.2d 1566, 1568 (11th Cir. 1987).  As such, they cannot form the

basis for habeas relief.  See, e.g., Carroll, 574 F.3d at 1365 (holding that a failure

to hold an evidentiary hearing in a state post-conviction proceeding was not a basis

for habeas relief); In re Rutherford, 437 F.3d 1125, 1127 (11th Cir. 2006) (finding

insufficient for habeas relief the petitioner's claim that the state post-conviction

court denied him due process by failing to provide mental health records of a

person the petitioner alleged had actually committed the crime (citing Quince, 360

F.3d at 1261–62)); Quince, 360 F.3d at 1262 (rejecting a habeas petition, which

alleged that the state judge presiding over the petitioner's post-conviction hearing

denied the petitioner due process by not recusing himself, because the claim did

not relate to the petitioner's conviction).

The alleged due process violation in Hill's case occurred during a state post-

60

conviction proceeding, and not during his criminal trial.[3]  The process afforded Hill

during that proceeding therefore had no bearing on the judgment that lead to his

conviction and sentence.  A writ of habeas corpus is not the proper remedy for this

alleged wrong.

Hill should instead have used this alleged due process violation as a means

for obtaining an evidentiary hearing in federal court.  A hypothetical application of

the Antiterrorism and Effective Death Penalty Act ("AEDPA"), Pub. L. No. 104-

132, 110 Stat. 1214, 28 U.S.C. § 2254, to Hill's case will demonstrate why this is

so.

As my previous discussion implies, Hill's only claim cognizable for habeas

relief is that he is mentally retarded and cannot constitutionally be executed

pursuant to the Eighth Amendment.  Because the Georgia courts determined that

he was not mentally retarded, Hill must first overcome 28 U.S.C. § 2254(d)'s

deferential hurdle.  Cullen v. Pinholster, 536 U.S. ____, 131 S. Ct. 1388,

1398–1400 (2011) (holding that federal courts must first determine whether a

petitioner satisfies § 2254(d) before they may consider new evidence acquired

during a federal hearing).  This determination was of a factual nature, and therefore

---

[3] Remember that the Georgia Supreme Court explicitly rejected the state post-conviction trial court's attempt to re-open Hill's conviction via a limited writ of habeas corpus.  Turpin v. Hill, 498 S.E.2d at 52, 53–54 (Ga. 1998).

falls under § 2254(d)(2)'s instruction that federal courts may not grant habeas relief unless the state court decision "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d)(2). The district court, or this court on appeal, would review the evidence introduced at Hill's post-conviction hearing and determine if the state court's ultimate finding of fact—that Hill was not mentally retarded—was "objectively unreasonable." See Lockyer v. Andrade, 538 U.S. 63, 76, 123 S. Ct. 1166, 1175, 155 L. Ed. 2d 144 (2003) (explaining that § 2254(d)(1)'s "unreasonable application" clause bars federal habeas relief unless the state court's decision was "objectively unreasonable," which is not synonymous with "clear error" or other "independent review" by the federal court) (citing Williams v. Taylor, 529 U.S. 362, 409, 120 S. Ct. 1495, 1521, 146 L. Ed. 2d 389 (2000)).

If the federal court found the Georgia courts' determination unreasonable, the federal court would then decide, in its independent judgment, whether Hill actually was mentally retarded. See McGahee v. Ala. Dep't of Corr., 560 F.3d 1252, 1266 (11th Cir. 2009) (reviewing a petitioner's claim de novo after determining that the petitioner satisfied § 2254(d)). At this point, Hill would likely ask for an evidentiary hearing; questions of mental retardation are, as his state proceedings suggest, incredibly fact intensive. To be eligible for an evidentiary

hearing, Hill would then need to demonstrate that he was diligent in attempting to develop the factual underpinnings of his claim. 28 U.S.C. § 2254(e)(2) (restricting a district court's discretion to hold evidentiary hearings where the petitioner "failed to develop the factual basis of a claim in State court proceedings"); Williams v. Taylor, 529 U.S. 420, 430, 120 S. Ct. 1479, 1487, 146 L. Ed. 2d 435 (2000) ("'[F]ailed to develop' implies some lack of diligence . . . ."). Nothing in the record suggests that Hill would be barred by § 2254(e)(2)'s restriction. Therefore, the district court would have had the discretion to hold an evidentiary hearing according to pre-AEDPA rules. Williams v. Allen, 542 F.3d 1326, 1346–47 (11th Cir. 2008) (analyzing the petitioner's request for an evidentiary hearing under the standards set out by Townsend v. Sain, 372 U.S. 293, 83 S. Ct. 745, 9 L. Ed. 2d 770 (1963)).

At this point, Hill could have argued that the district court was required to hold an evidentiary hearing because the beyond-a-reasonable-doubt standard deprived him of a "full and fair hearing." See Kelley v. Sec'y for Dep't of Corr., 377 F.3d 1317, 1334 (2004) (quoting Townsend, 372 U.S. at 313, 83 S. Ct. at 757); see also Quince, 360 F.3d at 1262–63 (stating that the state post-conviction judge's conflict of interest could have been a basis for arguing that the state post-

conviction proceeding was not "full and fair").[4]  His argument here would mirror

the grounds he asserts for habeas relief.  Claims of mental retardation are

incredibly fact-intensive and could devolve into a swearing match between

conflicting, and equally qualified, experts.  This swearing match could easily—if

not always—create reasonable doubt that the defendant is not mentally retarded.[5]

By erecting this higher burden, the State effectively put its thumb on the scale

against a defendant's mental-retardation defense.  The state post-conviction trial

court demonstrated this point; it found Hill mentally retarded by a preponderance

of the evidence, but not beyond a reasonable doubt.  Therefore, the State's unfair

thumb—the beyond-a-reasonable-doubt standard—deprived Hill of full and fair

post-conviction hearing, and he would be entitled to an evidentiary hearing in

federal court.[6]

---

[4]  The pre-AEDPA version of 28 U.S.C. § 2254(d) explicitly tied the "full and fair hearing" concept to due process.  That provision provided that state court fact findings would be presumed correct unless, "the fact finding procedure employed by the state court was not adequate to afford a full and fair hearing; . . . [or] the applicant was otherwise denied due process of law in the State court proceeding . . . ."  28 U.S.C. § 2254(d)(2), (7) (1995).

[5]  This appears to have happened in Hill's case.  Both the defense and the State presented the testimony of highly qualified, reputable expert witnesses.  Hill's expert opined that Hill had significant adaptive-functioning limitations and therefore was mentally retarded; the State's expert opined that he did not and therefore was not.  To prevail under the beyond-a-reasonable-doubt standard, the post-conviction court had to not only agree with Hill's expert; it had to find no basis for agreeing with the State's expert's opinion, which served as the main source of reasonable doubt against Hill's mental-retardation defense.

[6]  And, assuming he was granted a hearing, he would have to rebut the state court's finding that he was not mentally retarded with clear and convincing evidence.  28 U.S.C.

The previous paragraphs illustrate how Hill <u>should</u> have attacked the beyond-a-reasonable-doubt standard applied during his state post-conviction hearing. Instead, he asks this court for a writ of habeas corpus—and not an evidentiary hearing—to remedy this alleged due process violation. I would therefore affirm the denial of Hill's petition because due process violations during state post-conviction proceedings are not grounds for habeas relief.

§ 2254(e)(1); <u>Miller-El v. Dretke</u>, 545 U.S. 231, 266, 125 S. Ct. 2317, 2340, 162 L. Ed. 2d 196 (2005).

BARKETT, Circuit Judge, dissenting, in which MARCUS and MARTIN, Circuit Judges, join:

Although Georgia was the first state to declare that the mentally retarded should not be executed, it is the only one to guarantee precisely the opposite result by requiring offenders to prove beyond a reasonable doubt that they are mentally retarded.[1]  Requiring proof beyond a reasonable doubt, when applied to the highly subjective determination of mental retardation, eviscerates the Eighth Amendment constitutional right of all mentally retarded offenders not to be executed, contrary to Atkins v. Virginia, 536 U.S. 304, 321 (2002).

The fallacy underlying the majority's opinion is its belief that because Atkins "made no reference to, much less reached a holding on, the burden of proof," there is no "clearly established" Supreme Court precedent that explicitly tells us that the beyond a reasonable doubt standard is unconstitutional.  Thus, the majority holds that it must defer to the state court's decision upholding this standard.  Taken to its logical conclusion in this case, such deference permits states

---

[1] Georgia is the only state to require proof of mental retardation beyond a reasonable doubt.  Of those other states that impose the death penalty, twenty-three states and the federal government require the offender to prove his mental retardation by a preponderance of the evidence (Alabama, Arkansas, California, Idaho, Indiana, Kentucky, Louisiana, Maryland, Mississippi, Missouri, Nebraska, Nevada, New York, Ohio, Oklahoma, Pennsylvania, South Carolina, South Dakota, Tennessee, Texas, Utah, Virginia, and Washington).  New Mexico and Illinois both recently repealed their death penalty but previously had required a preponderance standard.  Another five states—Arizona, Colorado, Delaware, Florida, and North Carolina—have adopted a clear and convincing standard.  Six states, Connecticut, Kansas, Montana, New Hampshire, Oregon and Wyoming, have not set a standard of proof.

to adopt procedures that effectively exclude nearly every mentally retarded offender from the protection of <u>Atkins</u>. This deference requires so detailed and demanding a level of specificity in Supreme Court holdings that it eliminates any federal review whatsoever. Indeed, the State's position, endorsed by the majority, is that <u>Atkins</u> does not preclude the State from setting the bar of proof as high as it wishes or defining mental retardation to include only those persons whose IQ falls below 30, a level which includes only 4% of the mentally retarded, thereby leaving 96% of all recognized mentally retarded persons subject to execution. This cannot be squared with the command of <u>Atkins</u>, which protects <u>all</u> of the mentally retarded from execution—whether their mental retardation is mild or severe. And when a state court decision eviscerates the substantive constitutional right the Supreme Court has explicitly recognized, it is contrary to that Supreme Court precedent.

For the reasons amplified below, I believe that Supreme Court precedent has clearly established that no State is constitutionally permitted to execute mentally retarded offenders. Nor does the State have unfettered discretion to establish procedures that through their natural operation will deprive the vast majority of mentally retarded offenders of their Eighth Amendment right not to be executed. Because the state court's decision is contrary to clearly established Supreme Court

law, it is owed no AEDPA deference.  See 28 U.S.C. § 2254(d).[2]

### I.  Atkins Clearly Established that the Eighth Amendment Protects All Mentally Retarded Offenders from Execution

The majority first errs in suggesting that Atkins did not clearly establish that

all of the mentally retarded are protected from execution.  Contrary to both the

majority's assertion that "Atkins did not bestow a substantive Eighth Amendment

right to a fixed and rigid definition of mentally retarded persons" and the State's

---

[2] Under AEDPA, a federal court may grant habeas relief for a claim denied on the merits by a state court when the state court decision "resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States."  28 U.S.C. § 2254(d).  No AEDPA deference is due where preexisting Supreme Court precedent "dictate[s]" a rule or result contrary to the state court's decision.  Williams v. Taylor, 529 U.S. 362, 391 (2000); Carroll v. Sec'y, DOC, 574 F.3d 1354, 1370 (11th Cir. 2009).  A decision is contrary to clearly established federal law if "the state court applied a rule that contradicts with the governing law set forth by Supreme Court case law." Putman v. Head, 268 F.3d 1223, 1241 (11th Cir. 2001).  When the state court fails to "correctly identif[y]," Williams, 529 U.S. at 406, or applies a rule "substantially different from," id. at 405, the appropriate legal rule, the state court's decision is "contrary to" Supreme Court law.  Id. at 405-06.  Deciding a constitutional entitlement using a standard of proof foreclosed by Supreme Court precedent constitutes a decision that is "contrary to" federal law.  See id.

The majority details a litany of unrelated cases recently handed down by the Supreme Court to remind us that AEDPA constrains our review.  However, in all but one of the cases, the particular issue before the Court carried its own highly deferential standard of review, resulting in "dual layers" of deference, Renico v. Lett, 130 S. Ct. 1855, 1865 (2010).  See Cullen v. Pinholster, 131 S. Ct. 1388, 1403 (2011) ("Our review of the California Supreme Court's decision is thus doubly deferential.  We take a highly deferential look at counsel's performance [under] Strickland, through the deferential lens of § 2254(d)." (internal quotation marks and citations omitted)); Harrington v. Richter, 131 S. Ct. 770, 788 (2011) ("The standards created by Strickland and § 2254(d) are both highly deferential, and when the two apply in tandem, review is doubly so . . . ." (internal quotation marks and citations omitted)); Premo v. Moore, 131 S. Ct. 733, 740 (2011) (same); Lett, 130 S. Ct. at 1865 (holding that "AEDPA and our double jeopardy precedents" require "dual layers of deference"); Thaler v. Haynes, 130 S. Ct. 1171, 1172-73 (2010) (reviewing objection to a peremptory challenge under Batson v. Kentucky, 476 U.S. 79 (1986), which is reviewed on appeal under the "clearly erroneous" standard).  By contrast, Hill's claim is subject to only a single layer of AEDPA deference, unencumbered by a secondary layer of deference to the discretionary decisions of trial judges.

68

contention that it could, if it chose to do so, limit the protection of Atkins to those with an IQ of 30 or below, the Supreme Court extended the Eighth Amendment right to the entire class of mentally retarded, which it recognized in Atkins ranges from those with mild to profound mental retardation.

Relying on the medical consensus embodied in the clinical manuals of the American Psychiatric Association (APA) and the American Association on Mental Retardation (AAMR),[3] the Supreme Court recognized that mental retardation spans a spectrum of intellectual impairment, ranging from mild to moderate to severe to profound mental retardation. See Atkins, 536 U.S. at 309 n.3, 317 n.22 (citing APA, Diagnostic and Statistical Manual of Mental Disorders 41-43 (4th ed. 2000) ("DSM-IV"); AAMR, Mental Retardation: Definition, Classification, and Systems of Supports 5 (9th ed. 1992) ("AAMR 1992 Manual")); see also City of Cleburne v. Cleburne Living Ctr., 473 U.S. 432, 442 n.9 (1985) (acknowledging that "[m]entally retarded individuals fall into four distinct categories"—mild, moderate, severe and profound). Atkins's command to enforce the substantive constitutional right applies to this entire "range of mentally retarded offenders about whom there is a national consensus." Atkins, 536 U.S. at 317.

Moreover, within the universe of all mentally retarded individuals, 89% fall

---

[3] The AAMR is now known as the American Association on Intellectual and Developmental Disabilities (AAIDD).

in the mildly mentally retarded range, a fact the Supreme Court recognized many years before Atkins was decided.  See Cleburne Living Ctr., 473 U.S. at 442 n.9.  See also DSM-IV at 41-43 (classifying 89% of the universe of mentally retarded as mild, 7% as moderate, and the remaining 4% as severe or profound).  Indeed, Atkins specifically recognized that "[m]ild mental retardation is typically used to describe people with an IQ level of 50-55 to approximately 70."  536 U.S. at 309 n.3.  More importantly, the Court had previously recognized that the mildly mentally retarded were the only members of the class of all mentally retarded who would be likely to reach the point of sentencing in criminal cases.  See Penry v. Lynaugh, 492 U.S. 302, 333 (1989) (citing ABA Standards for Criminal Justice 7-9.1, commentary, p. 460 (2d ed. 1980)). Thus, of those who are mentally retarded, it is the mildly mentally retarded who not only are entitled to Atkins protection, but are most likely to need it.

The state court's decision, however, endorses the use of a standard of proof so high that it effectively limits the constitutional right protected in Atkins to only those who are severely or profoundly mentally retarded.  In holding that Atkins applies only to "those whose mental deficiencies are significant enough to be provable beyond a reasonable doubt," Head v. Hill, 587 S.E.2d 613, 622 (Ga. 2003), Georgia's determination is directly contrary to Atkins's command to protect

70

from execution all of the mentally retarded. That a mildly mentally retarded individual's "mental deficiencies" are less "significant" than the deficits of one who is severely or profoundly mentally retarded does not alter the indisputable fact that both are mentally retarded and entitled to the protection of the Eighth Amendment. Indeed, the offender in Atkins himself was only mildly mentally retarded. Atkins, 536 U.S. at 308. Thus, when the Supreme Court announced that "the Constitution places a substantive restriction on the State's power to take the life of a mentally retarded offender," id. at 321, there can be no doubt that it was extending this protection to all of the mentally retarded, whether classified as mild or "significant enough to be provable beyond a reasonable doubt." Head v. Hill, 587 S.E.2d at 622.

II.     States May Not Procedurally Eviscerate Substantive Constitutional Rights

The majority also errs in holding that Atkins does not place any constitutional restraint on state procedures pertaining to the execution of the mentally retarded. In Atkins, the Supreme Court not only prohibited the execution of any mentally retarded offender, but also commanded states to "develop[] appropriate ways to enforce the constitutional restriction upon their execution of sentences." 536 U.S. at 317. Thus, states have an affirmative duty to "develop[] appropriate ways to enforce" the constitutional right of the mentally retarded.

71

Notwithstanding the command to enforce the constitutional restriction, the majority holds that states have complete discretion to choose any procedures to govern the determination of mental retardation.  Not only is this position based on a flawed reading of Atkins, it is also contrary to Bailey v. Alabama, which clearly establishes that if a State's procedures transgress a substantive constitutional right, "in their natural operation," those procedures are unconstitutional.  219 U.S. 219, 239, 245 (1911).[4]

In Bailey, a defendant successfully challenged, as a violation of the Thirteenth Amendment, a state procedural rule.  Id. at 244.  Although the Court in Bailey recognized that states generally possess the power to prescribe procedures affecting their own laws, the Court went on to hold that this state power is limited when federal constitutional rights are at stake:

> [W]here the conduct or fact . . . , itself falls within the scope of a provision of the Federal Constitution, a further question arises.  It is apparent that a constitutional prohibition cannot be transgressed indirectly by the creation of a statutory presumption any more than it

---

[4] In Bailey, Alabama made it a crime to enter into a contract for employment with the intent to injure or defraud an employer by refusing to perform the contracted services after being paid.  Id. at 227-28.  The statute also provided that failure to perform the service without refunding the money was prima facie evidence of the fraudulent criminal intent.  Id.  The defendant challenged his conviction arguing, inter alia, that the statutory presumption of fraudulent intent violated the Thirteenth Amendment's prohibition against involuntary servitude.  Id. at 239.  The Supreme Court agreed, finding that the State's presumption was unconstitutional as a State could not "compel one man to labor for another in payment of a debt, by punishing him as a criminal if he does not perform the service or pay the debt" without violating the Thirteenth Amendment.  Id. at 244.

can be violated by direct enactment. <u>The power to create presumptions is not a means of escape from constitutional restrictions</u>. And the state may not in this way interfere with matters withdrawn from its authority by the Federal Constitution, or subject an accused to conviction for conduct which it is powerless to proscribe.

<u>Id.</u> at 239 (emphasis added). Succinctly put, "[w]hat the state may not do directly it may not do indirectly." <u>Id.</u> at 244. "If it cannot punish the servant as a criminal for the mere failure or refusal to serve without paying his debt, it is not permitted to accomplish the same result by creating a statutory presumption which, upon proof of no other fact, exposes him to conviction and punishment." <u>Id.</u> Likewise here, because the State cannot directly authorize the execution of the mentally retarded, it cannot do so indirectly by creating a statutory burden of proof which assures the same result. And whether a state procedural or evidentiary rule transgresses a constitutional command is judged by whether "the natural operation of the statute" produces the proscribed result, not whether the statute or its enactors betray such an intention. <u>Id.</u> Although the Georgia state court in this case was constrained by these binding Supreme Court holdings, it utterly failed to "correctly identif[y]" this precedent, <u>Williams</u>, 529 U.S. at 406, and instead "applied a rule that contradicts" it, <u>Putman</u>, 268 F.3d at 1241, thus depriving the state court's decision of AEDPA deference.

In <u>Speiser v. Randall</u>, the Court again imposed express constitutional limits

on state procedural rules implicating federal constitutional rights in the specific context of confronting a state law placing the burden of proof on an individual. 357 U.S. 513 (1958).[5] The Court declared that when federal constitutional rights are at issue, the State "must provide procedures which are adequate to safeguard against infringement of constitutionally protected rights." Id. at 521. More explicitly, because the vindication of a legal right often turns on the fact-finding process "the procedures by which the facts of the case are determined assume an importance fully as great as the validity of the substantive rule of law to be applied." Id. at 520. "[T]he more important the rights at stake the more important must be the procedural safeguards surrounding those rights." Id. at 520-21. Relying on Bailey, the Court in Speiser concluded that the State's placement of the burden of proof on the individual could not stand because it "necessarily produce[d] a result which the State could not command directly," in that it "result[ed] in a deterrence of speech which the Constitution makes free." Id. at 526. Again here, the state court utterly failed to identify and apply this governing Supreme Court precedent, by failing even to confront the fact that requiring an offender to prove mental retardation beyond a reasonable doubt "necessarily

---

[5] In Speiser, the Court was asked to consider the constitutionality of a state statute requiring taxpayers to bear the burden of proving that "they are not persons who advocate the overthrow of the government," which implicated First Amendment free speech rights. 357 U.S. at 521.

produce[s] a result which the State could not command directly," id., namely, making the mildly and even moderately mentally retarded eligible for execution.[6]

More recently, in Ford v. Wainwright, the Court reiterated the constitutional limitation on a State's power to prescribe procedures affecting the determination of a substantive constitutional right. 477 U.S. 399 (1986). In Ford, the Court was asked to resolve two questions: "whether the Eighth Amendment prohibits the execution of the insane" and, if so, whether one is entitled to a hearing on a claim of insanity. Id. at 405. In addressing the adequacy of the State's procedures to determine sanity, a majority of the Court first noted that if the right was merely a state-created one, the only question would be whether the State's procedures effected the State's own policy of protecting the insane from execution. Id. However, a majority of the Court explained the adequacy of a State's procedures must be viewed in a completely different light if "the Constitution places a substantive restriction on the State's power to take the life of an insane prisoner."

---

[6] The majority disregards Bailey and Speiser concluding that they are not Eighth Amendment cases. Indeed they are not. Instead the Court's pronouncement that "the state may not . . . interfere with matters withdrawn from its authority by the Federal Constitution," Bailey, 219 U.S. at 239, and hence "may not do indirectly" that which it "may not do directly," id. at 244 (emphasis added), is a command that is not limited to only the First Amendment (Speiser) or the Thirteenth Amendment (Bailey), but is one that applies to all federal substantive constitutional rights, including the Eighth Amendment right at issue in Atkins. Moreover, even if the challenged laws in those cases also violated individual procedural due process rights—as the majority reads these cases—the principle that State action cannot indirectly transgress substantive constitutional rights is no less the authoritative holding of Bailey and Speiser.

Id. Having then held that the execution of the insane was prohibited by the Eighth Amendment, a majority of the Court in Ford determined that the state procedures at issue were inadequate to protect the substantive federal constitutional right of the insane not to be executed. Id. at 416 (plurality opinion); id. at 424-25 (Powell, J., concurring in part and concurring in judgment). As in Ford, the State's burden of proof here is inadequate to protect the substantive federal constitutional right of the mentally retarded not to be executed. The state court disregarded this precedent in concluding that Georgia's standard of proof was constitutional.

In sum, by holding that "Atkins does not require any specific burden of proof and explicitly leaves such procedural matters to the states" without limitation, the majority improperly defers to a state court ruling that is in direct conflict with Bailey v. Alabama and its progeny. Under these cases, a State cannot create procedures that effectively eviscerate a substantive constitutional right, but rather "must provide procedures which are adequate to safeguard against infringement of [the] constitutionally protected right[]." Speiser, 357 U.S. at 521.

Thus, the question before the Supreme Court of Georgia was whether Georgia's burden of proof eviscerates the substantive constitutional right of the mentally retarded not to be executed. Rather than answering the question, as Bailey requires, of whether Georgia's standard of proof necessarily results in that

76

which Atkins has held is constitutionally prohibited, the state court wholly sidestepped the requisite analysis.

The state court's erroneous decision, to which the majority defers, instead was based on inapplicable Supreme Court precedent, further depriving the state court decision of AEDPA deference. See 28 U.S.C. § 2254(d). Rather than relying on the clearly established law of Bailey, Speiser, and Ford, the state court looked to the Supreme Court's decision in Leland v. Oregon, 343 U.S. 790 (1952). In that case, the Supreme Court held that the statutory requirement of proof beyond a reasonable doubt for the state-created affirmative defense of insanity did not violate the federal constitution. Leland, 343 U.S. at 799. The Supreme Court upheld Oregon's standard of proof expressly because the affirmative defense was exclusively a state-created right and did not involve any federal constitutional protection. Id. at 798. Simply put, there was no constitutional right at stake in Leland. Thus, Leland is inapposite on its own terms where the right at issue is one secured by the federal constitution. Where, as in this case, a constitutionally protected right—the Eighth Amendment—is at stake, Bailey, Speiser, and Ford, and not Leland, direct the analysis and require a different result.

The Supreme Court of Georgia's decision fails to recognize that when a constitutional right is at issue, a State cannot chose a process that will effectively

gut that right.  And the majority condones this disregard of Supreme Court law by simply asserting that because Atkins did not expressly establish a particular standard of proof, the State can choose any procedural scheme it wishes.  Clearly established Supreme Court law forbids this result.

III.    Requiring Proof Beyond A Reasonable Doubt When Applied to the Highly Subjective Determination of Mental Retardation Eviscerates the Eighth Amendment Right of Mentally Retarded Offenders Not To Be Executed

Requiring the mentally retarded to prove their mental retardation beyond any reasonable doubt will inevitably lead, through the rule's natural operation, to the frequent execution of mentally retarded individuals, thus depriving the mentally retarded of their constitutional right "to procedures which are adequate to safeguard against" their execution.[7]  See Speiser, 357 U.S. at 521.  This is so because placing this highest of standards of proof upon such offenders places upon them practically all of the risk of an erroneous determination.[8]  The risk is compounded here because the fact of mental retardation has to be based on a psychiatric diagnosis, "the subtleties and nuances" of which the Supreme Court has

---

[7] The State itself at oral argument recognized that Georgia's standard of proof beyond a reasonable doubt will result in the execution of some mentally retarded offenders.

[8] The Supreme Court has explained that the beyond a reasonable doubt standard shifts "almost the entire risk of error" to the party bearing the burden of proof.  Addington v. Texas, 441 U.S. 418, 424 (1979).

78

recognized "render certainties beyond reach in most situations." Addington, 441 U.S. at 430. Thus, mental retardation is almost never provable beyond a reasonable doubt (at least where contested), and the "risk" of an erroneous determination resulting in a wrongful execution approaches a near certainty.

For any factual question, "[t]he more stringent the burden of proof a party must bear, the more that party bears the risk of an erroneous decision." Cruzan v. Dir., Mo. Dept. of Health, 497 U.S. 261, 283 (1990).[9] Accordingly, when a procedural scheme requires one party to bear the burden of establishing a particular fact by the most stringent standard of proof that our legal system recognizes—proof beyond a reasonable doubt—it reflects society's desire that the party with the burden should bear the overwhelming risk of erroneous decisionmaking.[10] Thus, for example, because "the interests of the defendant [facing a criminal charge] are of such magnitude, . . . historically they have been protected by standards of proof designed to exclude as nearly as possible the likelihood of an erroneous judgment"—that is, by requiring proof of his guilt

---

[9] See also Cooper v. Oklahoma, 517 U.S. 348, 366 (1996) ("A heightened standard [of proof] does not decrease the risk of error, but simply reallocates that risk between the parties."); Addington, 441 U.S. at 423 ("The standard [of proof] serves to allocate the risk of error between the litigants.").

[10] As Justice Harlan explained in his concurring opinion, "[b]ecause the standard of proof affects the comparative frequency of . . . erroneous outcomes, the choice of the standard to be applied in a particular kind of litigation should, in a rational world, reflect an assessment of the comparative social disutility of each." In re Winship, 397 U.S. 358, 371 (1970).

beyond a reasonable doubt. Addington, 441 U.S. at 423 (emphasis added).[11] Here, despite longstanding principles,[12] the burden Georgia places on a capital offender to prove the ultimate fact on which his Eighth Amendment right depends allocates almost the entire risk of error to the offender while leaving virtually none of it with the State. In other words, Georgia has decided that it is far better to erroneously execute a mentally retarded person than to erroneously imprison for life one who is not mentally retarded.[13]

---

[11] This reflects society's belief that "it is far worse to convict an innocent man than to let a guilty man go free." In re Winship, 397 U.S. at 372 (Harlan, J., concurring).

[12] See Gregg v. Georgia, 428 U.S. 153, 187 (1976) (plurality opinion) ("When a defendant's life is at stake, the Court has been particularly sensitive to insure that every safeguard is observed."); Woodson v. North Carolina, 428 U.S. 280, 305 (1976) (plurality opinion) ("Because of th[e] qualitative difference [between life imprisonment and punishment by death], there is a corresponding difference in the need for reliability in the determination that death is the appropriate punishment in a specific case." (internal citation omitted)).

[13] The majority's argument on this point is internally inconsistent. On the one hand, the majority refuses to accept the possibility of error, arguing that because the states have unchecked authority to choose the procedures by which an offender must establish the fact of mental retardation, one who partakes of those procedures but fails to be labeled by the State as mentally retarded is therefore conclusively not mentally retarded. Under this reasoning, there can be no such thing as an erroneous determination of mental retardation—an offender is mentally retarded if and only if the output of the State's procedures declares him to be. By contrast, the majority later admits that "[e]very standard of proof allocates some risk of an erroneous factual determination to the defendant and therefore presents some risk that mentally retarded offenders will be executed in violation of Atkins," and, under any standard of proof, there is a risk "that the trier of fact will conclude that the offender is not mentally retarded when, in fact, he is." The majority cannot have it both ways.

Moreover, the majority's assertion that the beyond a reasonable doubt standard is not contrary to Atkins because it is merely "one aspect of a multifaceted fact-finding process under Georgia law" is beside the point. No matter how many procedures, hearings, and evidentiary opportunities Georgia provides, the law remains that every one of those procedural opportunities will be governed by one, and only one, standard of proof—beyond a reasonable doubt. Thus, the

Moreover, not only is the risk of error allocated overwhelmingly to the offender, but it is also enlarged exponentially by the highly subjective nature of the inquiry into mental retardation, making it even clearer that the reasonable doubt standard unquestionably will result in the execution of those offenders that Atkins protects. Mental retardation is a medical condition that is diagnosed only through, among other things, a subjective standard that requires experts to assess intellectual functioning and to interpret the meaning of behavior long into the offender's past. Given the imprecise nature of the mental retardation determination, "the possibility of mistaken factfinding inherent in all litigation," Speiser, 357 U.S. at 526 (emphasis added), becomes a near-certainty in this context.

Prior to its decision in Atkins, the Supreme Court had already expressed its doubt that psychiatric conditions could ever be proved beyond a reasonable doubt. In discussing the determination of an individual's mental condition in the context of civil commitment, the Court recognized that "[g]iven the lack of certainty and

_____

majority's concern that it is erroneous to consider the constitutionality of the standard of proof in isolation from the panoply of Georgia's procedures is of no moment. In resolving whether Georgia's standard of proof of beyond a reasonable doubt is contrary to Atkins's command, it is understood that the entirety of the procedural scheme for the factual determination of mental retardation, including each of the specific procedural "rights" that the majority cites, is subjected to the most exacting standard of proof that our legal system tolerates. Thus, just as the majority urges that "we should not ignore the full range of rights available to a capital defendant claiming mental retardation," we cannot ignore that each and every one of those "full range of rights" is constrained by the beyond a reasonable doubt standard of proof.

the fallibility of psychiatric diagnosis, there is a serious question as to whether [a litigant] could ever prove beyond a reasonable doubt that an individual is both mentally ill and likely to be dangerous. . . . The subtleties and nuances of psychiatric diagnosis render certainties virtually beyond reach in most situations." Addington, 441 U.S. at 429-30; see also Ford, 477 U.S. at 426 (Powell, J., concurring) (explaining that the question of sanity, unlike issues of historical fact, "calls for a basically subjective judgment" that "depends substantially on expert analysis in a discipline fraught with subtleties and nuances") (internal quotation marks omitted).

The determination of mental retardation—generally characterized as significantly subaverage intellectual functioning accompanied by significant deficits in adaptive skills that manifested before the age of eighteen[14]—presents exactly the same concerns noted in Addington and Ford. The determination inescapably rests on expert opinions, which in turn are "based on medical 'impressions' drawn from subjective analysis," Addington, 441 U.S. at 430, of scattered pieces of information, themselves distilled from the subjective views of others.

---

[14] Georgia's definition of mental retardation essentially tracks the authoritative medical definitions quoted by the Supreme Court in Atkins. See 536 U.S. at 308 n.3 (quoting DSM-IV; AAMR 1992 Manual); see Ga. Code Ann. § 17-7-131(a)(3).

An individual's intellectual functioning is measured through various standardized tests, the results of which are subject to variable interpretation.[15] And, the requirement that an individual possess adaptive skills impairments and that they have manifested before age eighteen further complicates the assessment. Adaptive behavior is "the collection of conceptual, social, and practical skills that have been learned and are performed by people in their everyday lives." See AAIDD, Intellectual Disability: Definition. Classification, and Systems of Support 45 (11th ed. 2010) ("AAIDD Manual"). The AAIDD itself admits that adaptive skills impairment is an "elusive" concept, depending on interviews, observation and professional judgment for diagnosis. See AAMR, Mental Retardation: Definition, Classification, and Systems of Supports 39-40, 89-90 (10th ed. 2002). The expert must make a subjective assessment of the individual's actions across various contexts in numerous relevant skill areas including "communication, self-care, home living, social/interpersonal skills, use of community resources, self-direction, functional academic skills, work, leisure, health, and safety," Atkins, 536 U.S. at 308 n.3, none of which is singularly determinative nor subject to

---

[15] For example, this circuit has recognized that the statistical phenomenon known as the Flynn Effect and the Standard Error of Measurement of plus or minus 5% can be applied by a test administrator to an individual's raw IQ test score when arriving at a final IQ score. See Thomas v. Allen, 607 F.3d 749, 753, 757-58 (11th Cir. 2010).

quantifiable precision.

This assessment also necessarily "looks backwards—past even the time of the crime and back into the developmental period," United States v. Hardy, 762 F. Supp. 2d 849, 881 (E.D. La. 2010), which may be as many as thirty years, as for Hill. According to professional standards, a proper retrospective analysis entails a "longitudinal approach of adaptive behavior that involves multiple raters, very specific observations across community environments . . . , school records, and ratings by peers in the development process." Thomas v. Allen, 614 F. Supp. 2d 1257, 1290 (N.D. Ala. 2009) (quoting AAIDD, User's Guide: Mental Retardation: Definition, Classification and Systems of Support 17-20 (2007) ("AAIDD User's Guide")), aff'd, 607 F.3d 749 (11th Cir. 2009). A clinician conducting this retrospective diagnosis must assess a "thorough social history" of the individual, including "investigat[ing] and organiz[ing] . . . all relevant information about the person's life," and "explor[ing] . . . possible reasons for absence of data or differences in data"; she must also "[c]onduct a thorough review of school records," and contact teachers and peers from the subject's adolescence, looking for evidence of deficits in cognitive, adaptive, or social skills. Id. (quoting AAIDD User's Guide, at 17-20).

Where the proof must be beyond a reasonable doubt, common sense tells us

that requiring reliance on these unavoidably incomplete and subjective sources of information renders the Atkins claimant's job a near-impossible task. Compounding the difficulty of this inherently subjective diagnosis is that all of the relevant proof will be presented to a judge or jury via the dueling views of mental health experts who have evaluated subtle and often contradictory aspects of the offender's behavioral history, often times through second- or third-hand accounts of a long distant past not subject to direct observation. Because of the subjectivity of both the diagnosis and the documentation of the offender's childhood, experts are bound to disagree about whether an offender is mentally retarded. Obviously, the less severe an individual's mental retardation, the more susceptible his condition is to differing interpretations by the experts. For these offenders, the result of the experts' dispute about whether the offender falls just within or just outside the ambit of mental retardation is some quantum of irreducible doubt—which in Georgia amounts to a death sentence.

Indeed, the Supreme Court discussed at length how Atkins himself was unable to convince a jury and the Virginia state courts that he was mildly mentally retarded because of the disagreement between his expert and the state's expert on the meaning of his intellectual functioning and behavioral history. See Atkins, 536 U.S. at 308-09 n.4, n.5, n.6. Despite the defense expert's testimony that Atkins had

a full-scale IQ of 59 and was only the second capital defendant, out of forty, that the expert had ever found to meet the criteria for mental retardation, the state's expert opined that Atkins was not mentally retarded but of "average intelligence, at least," id. at 309, and explained Atkins's abominable academic performance by saying he "did poorly because he did not want to do what he was required to do," id. at 309 n.6. And although the dissenting justices on the Virginia Supreme Court rejected the state's expert's opinion that "Atkins possesses average intelligence as 'incredulous as a matter of law,'" id. at 310 (quoting Atkins v. Commonwealth, 534 S.E.2d 312, 323 (Va. 2000)), the majority of the state supreme court refused to excuse Atkins from execution "merely because of his IQ score," id. (quoting Atkins v. Commonwealth, 534 S.E.2d at 321).

Likewise, the proceedings in Hill's case illustrate the inherent challenge of proving the fact of mental retardation beyond a reasonable doubt, again particularly for the mildly mentally retarded. After a lengthy hearing, the state habeas trial court found that Hill had proven beyond a reasonable doubt that he had an IQ indicating mild mental retardation. Yet, it also found that Hill had not demonstrated sufficient "deficits in adaptive skills functioning" beyond a reasonable doubt, only because there was no unanimity of opinion by the experts. Virtually all of the testifying experts personally met with Hill and reviewed

essentially the same documentation, yet they disagreed about the meaning of Hill's behavior during his developmental period. Thus, although the state habeas court ultimately found that Hill was probably mentally retarded,[16] it was precluded from granting Atkins relief because Georgia limited this constitutionally guaranteed right to only those individuals who could establish mental retardation beyond any reasonable doubt, a standard that cannot be met when experts are able to formulate even the slightest basis for disagreement.

Moreover, as the trial proceedings in both Atkins's and Hill's cases demonstrate, it is apparent that mildly mentally retarded offenders—89% of the universe of all mentally retarded[17]—face the greatest difficulty in satisfying the

---

[16] The majority suggests that there is no finding in this case that Hill is mentally retarded by a preponderance of the evidence. There is no question that the state habeas court found this to be a fact. See Head v. Hill, No. 94-V-216, Order on Petitioner's Motion for Reconsideration of Denial of Habeas Relief (Ga. Super. Ct. Nov. 19, 2002) ("Under [the preponderance] standard, this Court would find Petitioner to be mentally retarded."). That the state habeas court, on remand, complied with the mandate of the state supreme court to apply the higher standard of proof does not alter the fact that the state habeas court would have found Hill to be mentally retarded under a less stringent standard of proof.

The majority's efforts on several occasions to engage in its own speculation about Hill's mental retardation is not only an impermissible attempt to re-adjudicate the fact of Hill's mental retardation but also goes astray of the sole legal question before this *en banc* court.

[17] The mildly mentally retarded comprise the largest percentage of the universe of mentally retarded individuals who would be in the position to mount an Atkins claim. See Penry, 492 U.S. at 333 (noting that "most retarded people who reach the point of sentencing are mildly retarded"); Marc J. Tasse, Adaptive Behavior and the Diagnosis of Mental Retardation in Capital Cases, 16 Applied Neuropsychology 114, 117 (2009) (noting that the mildly mentally retarded make up the "vast majority of Atkins claims, if not all").

87

standard, and are at the greatest risk of an erroneous determination that they are not mentally retarded. In the first place, their IQ score is frequently within an error range of a non-mentally retarded person. Moreover, with respect to adaptive skills, most mentally retarded individuals, especially those whose mental retardation is mild, "present a mixed competence profile." AAIDD User's Guide, at 16. Individuals with mild mental retardation may "manifest subtle limitations that are frequently difficult to detect, especially in academic skills, planning, problem solving, and decision making, and social understanding and judgment." Id.

These adaptive abilities are frequently mischaracterized by judicial factfinders as evidence that the individual is not retarded. Indeed, this Court and the Fifth Circuit have recognized that mildly mentally retarded individuals are capable of holding jobs, driving cars, paying bills, taking care of their families, and so forth. See Thomas v. Allen, 607 F.3d 749, 757 (11th Cir. 2010); Wiley v. Epps, 625 F.3d 199, 217 (5th Cir. 2010); see also Holladay v. Allen, 555 F.3d 1346, 1363 (11th Cir. 2009) (defendant's expert "cogently explained" that "some of what Alabama points to as strengths are activities that an individual with mild mental retardation is capable of performing"). Therefore, the existence of the fact of mental retardation, especially in the case of mild mental retardation, will almost always be open to some doubt.

Indeed, a review of published Georgia state court cases adjudicating mental

retardation in the capital context confirms just how extraordinarily difficult it is for

an offender to meet the beyond a reasonable doubt standard.[18]  Although Georgia

[18] See Hall v. Lewis, 692 S.E.2d 580 (Ga. 2010); Foster v. State, 656 S.E.2d 838 (Ga. 2008); Ledford v. Head, 2008 WL 754486 (N.D. Ga. 2008); Rogers v. State, 653 S.E.2d 31, 35 (Ga. 2007); Schofield v. Holsey, 642 S.E.2d 56 (Ga. 2007); Perkinson v. State, 610 S.E.2d 533 (Ga. 2005); Morrison v. State, 583 S.E.2d 873 (Ga. 2003); Head v. Stripling, 590 S.E.2d 122 (Ga. 2003); Head v. Hill, 587 S.E.2d 613 (Ga. 2003); Head v. Ferrell, 554 S.E.2d 155 (Ga. 2001); Foster v. State, 525 S.E.2d 78, 79 (Ga. 2000); King v. State, 539 S.E.2d 783 (Ga. 2000); Heidler v. State, 537 S.E.2d 44 (Ga. 2000); Torres v. State, 529 S.E.2d 883 (Ga. 2000); Lyons v. State, 522 S.E.2d 225 (Ga. 1999); Palmer v. State, 517 S.E.2d 502 (Ga. 1999); Stephens v. State, 509 S.E.2d 605 (Ga. 1998); Jenkins v. State, 498 S.E.2d 502 (Ga. 1998); Mosher v. State, 491 S.E.2d 348 (Ga. 1997); Raulerson v. State, 491 S.E.2d 791 (Ga. 1997); Burgess v. State, 450 S.E.2d 680 (Ga. 1994); Williams v. State, 426 S.E.2d 348 (Ga. 1993).

To support its conclusion that "there is no evidence . . . that the reasonable doubt standard triggers an unacceptably high error rate for mental retardation cases," the majority suggests that it is relevant that in five of these cases the defendants received a life sentence instead of a death sentence.  In each of the cases, however, the defendant received a life sentence for reasons unrelated to his asserted mental retardation, even though he had raised a claim of mental retardation.

The majority also cites to four non-capital cases— Marshall v. State, 583 S.E.2d 884, 886 (Ga. 2003); Chauncey v. State, 641 S.E.2d 229, 230 (Ga. Ct. App. 2007); Laster v. State, 505 S.E.2d 560, 561 (Ga. Ct. App. 1998); and Moody v. State, 422 S.E.2d 70, 70 (Ga. Ct. App. 1992)— as proof that juries and judges in Georgia do find defendants to be mentally retarded. The majority fails to acknowledge, however, that although the verdict of "guilty but mentally retarded" is available in both capital and non-capital felony cases, see Ga. Code Ann. § 17-7-131(b)(1), the determination of mental retardation is of consequence only in capital cases. Non-capital offenders who are found "guilty but mentally retarded" are sentenced no different than any other defendant under Georgia's law. Id. § 17-7-131(g)(1) ("Whenever a defendant is found . . . guilty but mentally retarded, . . . the court shall sentence him or her in the same manner as a defendant found guilty of the offense."). Thus, because the stakes for mental retardation claims are exponentially higher in capital cases, the State is much more likely to vigorously oppose the assertion of mental retardation in a capital case. See Bobby v. Bies, 129 S. Ct. 2145, 2153 (2009) ("[P]rosecutors, pre-Atkins, had little incentive vigorously to contest evidence of retardation.  [Atkins's prohibition on execution of the mentally retarded] substantially altered the State's incentive to contest [offenders'] mental capacity . . . ."). This bears out in the four cases the majority relies on and one additional as well.  See Sims v. State, 614 S.E.2d 73, 75 (Ga. 2005). Indeed, of the nine reported non-capital cases in Georgia in which mental retardation was at issue, the defendant was able to successfully establish his mental retardation in five of them.

has ostensibly outlawed the imposition of the death penalty for mentally retarded offenders for over twenty years, of the twenty-two reported capital cases involving mental retardation claims, only one defendant has ever successfully established his mental retardation beyond a reasonable doubt.  See Lewis, 692 S.E.2d at 593.[19]

Rather than securing the constitutional right at issue, Georgia and the majority have effectively revoked that right.  If an offender is erroneously found not mentally retarded, he will be executed; if an offender is erroneously found mentally retarded, the government's only detriment is that of incarcerating for life one who is not mentally retarded.  To eliminate the risk of the latter by

---

The majority also notes that in Walker v. State, 653 S.E.2d 439, 447 (Ga. 2007), the co-defendant Griffin had been "adjudicated mentally retarded."  However, Griffin entered a plea of "guilty but mentally retarded," rather than receiving that verdict at trial.  See Brief On Behalf of the Appellee By the Attorney General, Walker, 653 S.E.2d 439, 2007 WL 4997723, at *11 n.5 (Mar. 27, 2007).  Under Georgia law, to accept a plea of "guilty but mentally retarded," a judge need not find the defendant mentally retarded beyond a reasonable doubt but need only find that there is a factual basis that the defendant is mentally retarded.  Ga. Code Ann. § 17-7-131(b)(2).

[19] And in that case, the State did not even mount a credible challenge to the offender's claim.  Three experts testified that the offender was mentally retarded, and the state habeas court found their testimony scientifically sound and credible.  Response Brief of Appellee/Petitioner, Lewis, 692 S.E.2d 580, 2009 WL 4028408, at *9 (Oct. 8, 2009).  By contrast, the state habeas court found the State's psychologist to be a "hired gun" who lacked expertise in the field of mental retardation and whose opinion was a "sham" premised on a repeated willingness to disregard the established standards of the psychological profession.  Id.  On the basis of these factual findings, the court found the petitioner had established mental retardation beyond a reasonable doubt.  Id.  The State never challenged this determination.  Lewis, 692 S.E.2d at 593.  Notably, no other capital offender in any reported case has ever been able to establish his mental retardation beyond a reasonable doubt so as to avail himself of Georgia's prohibition on execution of the mentally retarded.

exponentially increasing the risk of the former[20] is contrary not only to <u>Atkins</u>, but also to the Supreme Court's requirement that the margin of error in fact-finding be reduced on the side of an individual's constitutionally protected rights.[21]  This utterly one-sided risk of error is all the more intolerable when the individual right at stake is a question of life or death.[22]

---

[20] The Supreme Court has recognized that these two types of error are inversely related, and that the beyond a reasonable doubt standard of proof reduces the risk of one type of error by maximally increasing the risk of the opposite error.  <u>Addington</u>, 441 U.S. at 423-24 (beyond a reasonable doubt standard "exclude[s] as nearly as possible" the risk of one type of error by shifting "almost the entire risk of error" to the other party). The ratio between the two types of errors yielded by the beyond a reasonable doubt standard has been estimated at ten to one.  <u>See</u> 4 W. Blackstone, Commentaries 358 ("[T]he law holds[] that it is better that ten guilty persons escape, than that one innocent suffer.").  That is, in this context, it will produce roughly ten executions of mentally retarded individuals for every one non-mentally retarded individual erroneously spared from execution.

[21]  Several Supreme Court cases establish that states may not require the individual putative holder of a substantive constitutional right to bear a significant majority of the risk of an erroneous determination of a fact that implicates the right.  <u>See e.g.</u>, <u>Cooper</u>, 517 U.S. at 364-65 (holding unconstitutional the requirement that a defendant to prove competence to stand trial by clear and convincing evidence because the consequences "of an erroneous determination of competence are dire" for defendant while "the injury to the State of the opposite error—a conclusion that the defendant is incompetent when he is in fact malingering—is modest"); <u>Addington</u>, 441 U.S. at 427 (requiring the State to meet a heightened clear-and-convincing standard for civil involuntary commitment because a defendant with liberty at stake "should not be asked to share equally with society the risk of error"); <u>Santosky v. Kramer</u>, 455 U.S. 745, 755 (1982) (requiring the State to bear a heightened burden of at least clear and convincing evidence in parental termination proceedings, which the Court recognized involved a parent's fundamental liberty interest in the care, custody, and management of their child).

[22] "In capital proceedings generally, [the Supreme] Court has demanded that factfinding procedures aspire to a heightened standard of reliability . . . [because] execution is the most irremediable and unfathomable of penalties."  <u>Ford</u>, 477 U.S. at 411 (plurality opinion).  "When the choice is between life and death, th[e] risk [that the death penalty will be imposed in spite of factors which may call for a less severe penalty] is unacceptable and incompatible with the commands of the Eighth and Fourteenth Amendments."  <u>Lockett v. Ohio</u>, 438 U.S. 586, 605 (1978) (Burger, C.J.) (plurality opinion).

91

IV.    Conclusion

No State has the power to deny citizens any of their federal constitutional rights.  Atkins has recognized the federal constitutional right of mentally retarded offenders not to be executed.  Georgia, therefore, cannot indirectly authorize the execution of mentally retarded offenders through a procedure that in practical operation accomplishes that result.  Because Georgia's standard of proof will inevitably result in the execution of mentally retarded offenders and thus is contrary to the dictates of Atkins, I dissent.

WILSON, Circuit Judge, dissenting, in which MARTIN, Circuit Judge, joins:

The majority today not only reaches the wrong answer, it asks the wrong question. Suppose that, instead of a beyond-a-reasonable-doubt standard, the State of Georgia required mentally retarded death-row inmates to prove their Atkins[1] claims beyond any shadow of a doubt—a standard requiring, under Georgia law, that prisoners obtain the unanimous consent of a 100-member panel of state-appointed psychologists, ten consecutive IQ tests showing an intelligence quotient of not more than thirty, and supporting affidavits from the victims' families and the Governor. Could fair-minded jurists disagree that the foregoing standard is unconstitutional? Of course not. But in order to endorse not only the result, but the logic of today's majority opinion, one must answer yes.

We are not asking whether the Supreme Court has determined that the Constitution requires a particular burden of proof for Atkins claims; it plainly has not. We are not asking whether the Supreme Court has left it to states to draw the exact boundaries and define the precise contours of the right announced in Atkins; it plainly has. Our job, instead, is simply to ask whether it is beyond fair-minded disagreement that the boundaries applied by the State of Georgia in this case run afoul of Supreme Court holdings, including that of Atkins itself.

---

[1] Atkins v. Virginia, 536 U.S. 304, 321, 122 S. Ct. 2242, 2252 (2002) (holding that execution of mentally retarded criminals is unconstitutional).

I believe that it is, and I endorse the substance of Judge Barkett's dissent. However, I part company with Judge Barkett in that I tend to see this as an "unreasonable application"—instead of a "contrary to"—case under AEDPA and, therefore, conceptualize our inquiry as follows.

Atkins declared a federal constitutional right, but left it to the individual states to define that right's exact boundaries—thereby creating a zone of discretion for state action.[2] On habeas review, AEDPA essentially broadens that zone of discretion, so that federal courts must respect states' boundaries (i.e., definitions, procedures, burdens, etc.) even if those courts believe them to be erroneous, so long as they are not unreasonable. Nevertheless, at some extreme point, the clear mandate of Atkins and the Due Process Clause must limit a state's ability to set overly restrictive boundaries. And in rare cases, a state's Atkins boundaries may be so restrictive that they fall outside of even the AEDPA buffer to the Atkins zone of discretion. For the reasons described in Judge Barkett's dissent, I believe this is one of those rare cases.

It is no answer to simply say that the Supreme Court has not explicitly

---

[2] Contrary to the majority's contention, the Supreme Court's denial of certiorari in three cases where Georgia inmates challenged the burden of proof for establishing mental retardation in no way reflects the Court's approval of Georgia's standard. See, e.g., Missouri v. Jenkins, 515 U.S. 70, 85, 115 S. Ct. 2038, 2047 (1995) ("Of course, 'the denial of a writ of certiorari imports no expression of opinion upon the merits of the case, as the bar has been told many times.'" (quoting United States v. Carver, 260 U.S. 482, 490, 43 S. Ct. 181, 182 (1923))).

94

passed on the <u>Atkins</u> burden of proof question, or that <u>Atkins</u> left it to the states to set their own procedures. AEDPA "recognizes . . . that even a general standard may be applied in an unreasonable manner." <u>Panetti v. Quarterman</u>, 551 U.S. 930, 953, 127 S. Ct. 2842, 2858 (2007). And with respect to the particular general standard at issue in this case—that it is unconstitutional to execute every class of mentally retarded persons (<u>i.e.</u>, mild, moderate, severe, and profound)—we have a unique perspective on what it means for that standard to be applied unreasonably. The Supreme Court has already shown us by analogy.

<u>Atkins</u> relied, in large part, on a recently developed national consensus against executing every class of mentally retarded persons. 536 U.S. at 313–16, 122 S. Ct. at 2248–50. But recognizing that there may be "serious disagreement[s]" about determining exactly "which offenders are in fact retarded," and that "[n]ot all people who claim to be mentally retarded will be so impaired as to fall within the range of mentally retarded offenders about whom there is a national consensus," the Court declared: "As was our approach in <u>Ford v. Wainwright</u>, with regard to insanity, 'we leave to the State[s] the task of developing appropriate ways to enforce the constitutional restriction upon [their] execution of sentences.'" <u>Id.</u> at 317, 122 S. Ct. at 2250 (alterations in original) (citing 477 U.S. 399, 405, 416–17, 106 S. Ct. 2595, 2599, 2605 (1986) (holding

95

that the Constitution forbids execution of the insane)) (internal citation omitted).

Consequently, Ford is our guide for understanding of what is, and what is not, an "appropriate way[] to enforce" the Atkins constitutional restriction.

Upon turning to the cited portions of Ford, we discover that the Supreme Court's delegation to the states has limits. After determining that it is unconstitutional to execute an insane person, the Court addressed what was required of states in the setting their own procedures. See Ford, 477 U.S. at 416–17, 106 S. Ct. at 2605 (plurality opinion). It began by confirming that states should have substantial discretion in choosing their methods, stating that "a full trial on the issue of sanity" was not required to "protect the federal interests" at stake. See id. And it specifically recognized that "some high threshold showing on behalf of the prisoner" may be "a necessary means to control the number of nonmeritorious or repetitive claims of insanity." Id. at 417, 106 S. Ct. at 2605. But after acknowledging that states must have flexibility in determining who is, and who is not, legally insane, the Court's instructions culminated with this clear and forceful mandate:

> Yet the lodestar of any effort to devise a procedure must be the overriding dual imperative of providing redress for those with substantial claims and of encouraging the accuracy in the factfinding determination.

96

Id. (emphases added).  I believe Judge Barkett's opinion demonstrates beyond any

reasonable dissent how Georgia's procedures cannot be squared with this explicit

admonition.  And if there was any doubt about how those dual imperatives interact

with our current deferential standard of review under AEDPA, it was resolved by

the Supreme Court's example in Panetti v. Quarterman, 551 U.S. at 954, 127 S. Ct.

at 2859.

In Panetti, the Supreme Court—in a materially indistinguishable posture

from that which we occupy today—addressed whether Texas's procedures for

applying Ford's general constitutional prohibition were contrary to or an

unreasonable application of clearly established federal law.  Id. at 952–54, 127 S.

Ct. at 2858–59.  Notwithstanding Ford's explicit delegation to the states and

AEDPA deference, the Supreme Court concluded that Panetti was entitled to

plenary federal review of his constitutional claim.  Id. at 954, 127 S. Ct. at 2859.

Recognizing that Justice Powell's controlling concurrence in Ford mandated that a

state's "substantial leeway [in] determin[ing] what process best balances the

various interests at stake" be limited by "the 'basic requirements' required by due

process," the Court found myriad defects in the State's approach to enforcing

Ford's constitutional restriction warranting de novo review.  See id. at 950–52, 127

S. Ct. at 2856–57 (cataloging errors demonstrating that "the state court failed to

97

provide petitioner with the minimum process required by Ford"). It did so

notwithstanding a lack of specific case law on Panetti's particular complaints as

today's majority would require, but by relying instead on Justice Powell's general

discussion regarding the basic requirements of due process, as well as the Court's

own assessment that "[t]he state court failed to provide petitioner with a

constitutionally adequate opportunity to be heard." Id. at 952, 127 S. Ct. at 2858.

In other words, the Supreme Court recognized that Ford set a constitutional floor,

not a target. And because "the factfinding procedures upon which the [state] court

relied were 'not adequate for reaching reasonably correct results' or, at a minimum,

resulted in a process that appeared to be 'seriously inadequate for the ascertainment

of the truth,'" they represented an "unreasonable application" of Ford's general

standard under AEDPA. Id. at 954, 127 S. Ct. at 2859 (quoting Ford, 477 U.S. at

423–24, 106 S. Ct. at 2609 (opinion of Powell, J.)).[3]

The Supreme Court in Atkins unequivocally held that the Constitution

prohibits the execution of mentally retarded persons. 536 U.S. at 321, 122 S. Ct. at

2252. And it unequivocally invoked its approach in Ford. Id. at 317, 122 S. Ct. at

---

[3] Panetti provides the clearest and most instructive Supreme Court guidance on how we must conduct the inquiry before us. Although not a case specifically involving mental retardation (and, in the majority's view, therefore completely inapposite), Panetti elucidates the standard of AEDPA deference due when federal courts consider the constitutionality of procedures that burden a petitioner's substantive constitutional rights.

2250. Moreover, as Judge Barkett's opinion demonstrates, there are several other unimpeachable—albeit general—principles of constitutional law that must be brought to bear in our determination of where Atkins's constitutional floor was set and what exactly it proscribes. In particular, I find the majority's attempt to ignore the guidance of cases such as Cooper v. Oklahoma, 517 U.S. 348, 366–69, 116 S. Ct. 1373, 1382–84 (1996) (holding that state law requiring defendant to prove incompetence to stand trial by clear-and-convincing evidence violated the Due Process Clause), and Addington v. Texas, 441 U.S. 418, 431, 99 S. Ct. 1804, 1812 (1979) (holding that the burden of proof for involuntary civil commitment must exceed a preponderance of the evidence) entirely unavailing; in Ford, the Supreme Court explicitly referenced the procedures governing these parallel proceedings as "instructive analogies" that inform states' choices of how to appropriately enforce Ford's constitutional mandate. 477 U.S. at 416–17 & n.4, 106 S. Ct. at 2605 (plurality opinion).

As the Supreme Court did in Panetti, we must consider all relevant clearly established legal rules and standards to make a substantive determination, through the lens of the reasonable jurist, as to where Georgia's procedure falls on the spectrum of constitutional appropriateness, relative to the floor set by Atkins. In other words, in this Atkins case, we are not asking what the constitutionally proper

burden of proof is. We are not even asking what the constitutionally proper burden of proof should be. We are simply asking what the constitutionally proper burden of proof <u>cannot</u> be. And it cannot be this.

The beyond-a-reasonable doubt standard is patently inappropriate in the <u>Atkins</u> context. Since the majority invokes the useful, but imperfect parallel of cases dealing with burdens of proof and mental illness, I rely upon the words of Chief Justice Burger, speaking for a unanimous Supreme Court, to illustrate the point:

> The subtleties and nuances of psychiatric diagnosis render certainties virtually beyond reach in most situations. The reasonable-doubt standard of criminal law functions in its realm because there the standard is addressed to specific, knowable facts. Psychiatric diagnosis, in contrast, is to a large extent based on medical "impressions" drawn from subjective analysis and filtered through the experience of the diagnostician. This process often makes it very difficult for the expert physician to offer definite conclusions about any particular patient. Within the medical discipline, the traditional standard for "factfinding" is a "reasonable medical certainty." If a trained psychiatrist has difficulty with the categorical "beyond a reasonable doubt" standard, the untrained lay juror—or indeed even a trained judge—who is required to rely upon expert opinion could be forced by the criminal law standard of proof to reject commitment for many patients desperately in need of institutionalized psychiatric care.

<u>Addington</u>, 441 U.S. at 430, 99 S. Ct. at 1811.

Just like a psychiatric diagnosis of mental illness, the psychological diagnosis of mental retardation deals not with "specific, knowable facts," but, "in contrast, is to a large extent based on medical 'impressions' drawn from subjective analysis and filtered through the experience of the diagnostician." What is more, unlike a diagnosis of mental illness, which deals solely with the defendant's mental state today, a diagnosis of mental retardation relies on the defendant's mental capacity years, if not decades, in the past. See, e.g., O.C.G.A. § 17-7-131(a)(3) (defining mental retardation as requiring intellectual deficiency during a person's "developmental period"). Moreover, since in reality a mildly retarded defendant can only prove an Atkins claim using expert medical testimony, I am struck by the gross disparity between the certainty communicated to the factfinder by that type of expert opinion—a reasonable degree of medical certainty—and that required by Georgia's Atkins burden of proof—proof beyond any reasonable doubt. What alchemy might allow a mildly retarded Atkins petitioner to transform these imprecise, subjective, and retrospective elements into a successful constitutional claim in Georgia is beyond my imagination.

Whatever standard the Supreme Court may one day set, even with the shield of AEDPA deference, Georgia's current burden of proof does not honor the command of Atkins. As a consequence, I respectfully dissent.

101

MARTIN, Circuit Judge, dissenting:

Nearly forty-five years ago, the Supreme Court warned: "[w]ith faithfulness to the constitutional union of the States, we cannot leave to the States the formulation of the authoritative laws, rules, and remedies designed to protect people from infractions by the States of federally guaranteed rights." Chapman v. California, 386 U.S. 18, 21, 87 S. Ct. 824, 826 (1967). I fully join in Judge Barkett's well-reasoned dissent, and I write separately only to emphasize the ways in which I believe the majority has run afoul of Chapman's venerable admonition.

As the Supreme Court did in Ford v. Wainwright, 477 U.S. 399, 106 S. Ct. 2595 (1986), with regard to the constitutional ban against executing the insane, in Atkins it left "to the State[s] the task of developing appropriate ways to enforce the constitutional restrictions upon" executing the mentally retarded.[1] Atkins v. Virginia, 536 U.S. 304, 317, 122 S. Ct. 2242, 2250 (2002) (quoting Ford, 477 U.S. at 416–417, 106 S. Ct. at 2605 (plurality opinion)). But as Panetti v. Quarterman,

---

[1] The majority is quite right that Georgia was the first state to ban execution of the mentally retarded. However, this fact sheds little light on the Eighth Amendment issue we undertake to decide here. In Ford itself, the State of Florida had a pre-existing ban on executing the insane. See Ford, 477 U.S. at 403, 106 S. Ct. at 2598 (referring to Fla. Stat. § 922.07 (1985) (proceedings when person under sentence of death appears to be insane); see also Goode v. Wainwright, 448 So. 2d 999, 1001–02 (Fla. 1984) (holding that an "insane person cannot be executed," but that Florida's statutory procedure embodied in Fla. Stat. § 922.07 does not violate due process). Yet, the Supreme Court found those procedures inadequate to enforce the Eighth Amendment right at issue. Ford, 477 U.S. at 416–17, 106 S. Ct. at 2605 (plurality opinion); id. at 425–27, 106 S. Ct. at 2609–10 (Powell, J., concurring in part and concurring in the judgment).

102

551 U.S. 930, 127 S. Ct. 2842 (2007), makes plain, even under AEPDA deference, the fact that States have leeway to enforce Ford's substantive restrictions does not mean that they are free to adopt any procedures they choose to enforce federal constitutional rights. See id. at 952–54, 127 S. Ct. at 2858–59. Rather, as Panetti illustrates, once a substantive federal right is established, the State must provide adequate procedures for protecting that right. Id. at 952, 127 S. Ct. at 2858. Atkins, like Ford, commands States to develop only "appropriate" procedures to "enforce" the Eighth Amendment right at issue. Atkins, 536 U.S. at 317, 122 S. Ct. at 2550.

Panetti in turn instructs us how to measure this "appropriateness" under AEDPA review. Indeed, Panetti is instructive for Mr. Hill's case in many ways.[2] First, it confirms that rights guaranteed under the Eighth Amendment must be protected by procedures which comport with "basic requirements" of Due Process. Panetti, 551 U.S. at 949–50, 127 S. Ct. at 2856 (quoting Ford, 477 U.S. at 427, 106 S. Ct. at 2610) (Powell, J., concurring in part and concurring in the judgment). Of

---

[2] By saying Panetti is instructive to Mr. Hill's case, I do not mean to suggest that Panetti itself provides the source of "clearly established" federal law by which Georgia's standard of proof must be measured. Panetti is relevant for a different reason. It illustrates how even a general constitutional standard may be applied in an unreasonable manner under AEDPA's deference standard. See Panetti, 551 U.S. at 953, 127 S. Ct. at 2858. This is a principle of statutory construction concerning the interpretation and application of ADEPA itself. Thus, the fact that Panetti did not involve mental retardation, a standard of proof, or was decided after Head v. Hill, 587 S.E.2d 613 (Ga. 2003) (Hill III), does not detract from the lesson it provides here.

103

course, Due Process under the Fourteenth Amendment is only one clearly established measure of the adequacy of Georgia's mental retardation procedures. The substantive right recognized in Atkins is different in kind, and arguably more important in a Due Process sense, than the substantive right recognized in Ford.[3] Justice Powell pointed out in Ford that the question of whether an inmate who has already been convicted is competent to be executed is quite different from that of whether he is eligible to be sentenced to death in the first place. He said it this way: "the only question raised [by incompetency to be executed] is not *whether*, but *when*, [an] execution may take place. This question is important, but it is not

---

[3] Judge Posner recognized in a different context,

> A state, although limited in its right under the Constitution to put to death or even on trial a person who is mentally incompetent, Ford, 477 U.S. 399, 106 S. Ct. 2595 (1986); Medina v. California, 505 U.S. 437, 451–53, 112 S. Ct. 2572, 2581 (1992), is not constitutionally obligated to recognize a defense of insanity-several states have abolished the defense . . .

Despears v. Milwaukee County, 63 F.3d 635, 637 (7th Cir. 1995) (parallel citations omitted). There is a critical distinction between the Due Process required to protect substantive rights derived from the United States Constitution on the one hand, see Cooper v. Oklahoma, 517 U.S. 348, 355–56, 116 S. Ct. 1373, 1377 (1996) (holding that state law presuming criminal defendant is competent to stand trial unless he proves incompetence by clear and convincing evidence violates Due Process), and state created rights on the other, see Leland v. Oregon, 343 U.S. 790, 799, 72 S. Ct. 1002, 1007–08 (1952) (holding state law requiring defendant to prove state created insanity defense beyond a reasonable doubt does not violate Due Process). Given this important distinction, which was well established at the time Hill III was decided, and the reasoning and authorities discussed in Judge Barkett's dissent, I cannot agree with the majority's conclusion that either Leland or Ford "lend enough support" to the Georgia Supreme Court's decision to make it consistent with, or a reasonable application of, clearly established Supreme Court precedent.

comparable to the antecedent question whether petitioner should be executed at all." Ford, 477 U.S. at 425, 106 S. Ct. at 2610 (Powell, J., concurring in part and concurring in the judgment). Based on this distinction, Justice Powell concluded that the Supreme Court's "decisions imposing heightened procedural requirements on capital trials and sentencing proceedings—e.g., Lockett v. Ohio, 438 U.S. 586, 98 S. Ct. 2954 (1978) (plurality opinion); Turner v. Murray, 476 U.S. 28, 106 S. Ct. 1683 (1986)—do not apply in [the determination of insanity at time of execution] context." Id. But even with this view, Justice Powell joined that portion of Ford which recognized that "the Eighth Amendment has been recognized to affect significantly both the procedural and the substantive aspects of the death penalty." Id. at 405, 106 S. Ct. at 2599 (majority opinion).

Atkins is an Eighth Amendment decision about whether, not when, a person may be executed. Thus, the determination of whether a capital defendant is mentally retarded as a predicate to imposing a death sentence "calls for no less stringent standards than those demanded in any other aspect of a capital proceeding." Ford, 477 U.S. at 411–12, 106 S. Ct. at 2603 (plurality opinion). This means Georgia's mental retardation procedures must meet not only Due Process requirements, but also the Supreme Court's clearly established Eighth Amendment principles demanding more reliability and accuracy in capital

proceedings.

Second, like Hill, Panetti involves a substantive Eighth Amendment prohibition against carrying out a sentence of death against a certain class of prisoners—the mentally retarded in Hill and the insane in Panetti. Third, in both cases AEDPA bars federal habeas corpus relief unless the state court decision is contrary to, or involves an unreasonable application of, clearly established federal law. See 28 U.S.C. § 2254(d)(1). Fourth, both Hill and Panetti involve Eighth Amendment prohibitions for which the States were expressly given "the task of developing appropriate ways to enforce the constitutional restrictions." Atkins, 536 U.S. at 317, 122 S. Ct. at 2250 (quoting Ford, 477 U.S. at 416–17, 106 S. Ct. at 2605 (plurality opinion)). Finally, the question decided in Panetti is strikingly similar to the question presented by Hill: whether the procedures provided by the state court were adequate to protect the constitutional right—specifically, the right not to be executed if insane at the time of execution in Ford and the right of the mentally retarded not to be executed in Hill.

In light of the similarity of Mr. Hill's case to Panetti, I cannot agree with the majority's conclusion that AEDPA's deference standard precludes us from finding that Georgia's beyond a reasonable doubt standard is not contrary to or an unreasonable application of clearly established Supreme Court precedent. Just

106

because <u>Atkins</u>, like <u>Ford</u>, announced a general standard does not mean that Georgia's application of <u>Atkins</u> to Mr. Hill cannot be contrary to, or involve an unreasonable application of, <u>Atkins</u>'s constitutional restriction against executing mentally retarded defendants. On this issue, <u>Panetti</u> is clear:

> That the [<u>Ford</u>] standard is stated in general terms does not mean the application was reasonable. AEDPA does not require state and federal courts to wait for some nearly identical factual pattern before a legal rule must be applied. Nor does AEDPA prohibit a federal court from finding an application of a principle unreasonable when it involves a set of facts different from those of the case in which the principle was announced. The statute recognizes, to the contrary, that even a general standard may be applied in an unreasonable manner.

<u>Panetti</u>, 551 U.S. at 953, 127 S. Ct. at 2858 (citations and quotation marks omitted). As the Supreme Court did in <u>Panetti</u>, I would hold here that "the factfinding procedures upon which the [state] court relied were not adequate for reaching reasonably correct results, or, at a minimum, resulted in a process that appeared to be seriously inadequate for the ascertainment of the truth" of whether a defendant is eligible to be executed. <u>Id.</u> at 954, 127 S. Ct. at 2859 (citation and quotation marks omitted). For all the reasons set forth by Judge Barkett, and because the Eighth Amendment demands heightened reliability and accuracy, I conclude that this standard has plainly been violated in Mr. Hill's case.

This is so because the beyond a reasonable doubt standard for proving mental retardation is fundamentally at odds with the basis for the holding in

107

Atkins. As detailed in Judge Barkett's opinion, the state habeas trial court, after an extensive evidentiary hearing concerning mental retardation, has already determined that Mr. Hill is more likely than not mentally retarded, yet he cannot prove beyond a reasonable doubt that he is mentally retarded. Executing an inmate fitting this description does not serve the penological purposes of the death penalty identified in Atkins itself: deterrence and retribution. Atkins, 536 U.S. at 318–20, 122 S. Ct. at 2251. Atkins instructs that because the mentally retarded are less morally culpable, and because our Eighth Amendment jurisprudence "seeks to ensure that only the most deserving of execution are put to death, an exclusion for the mentally retarded is appropriate." Id. at 319, 122 S. Ct. at 2251. Atkins also plainly tells us that "executing the mentally retarded will not measurably further the goal of deterrence." Id. at 320, 122 S. Ct. at 2251. Thus executing Mr. Hill, who has already demonstrated that he is mentally retarded and therefore less morally culpable because of his "cognitive and behavioral impairments," id. at 320, 122 S. Ct. at 2251, is contrary to Atkins insofar as it will not "measurably further the goal[s] of deterrence" or retribution. Id.

To conclude, Georgia's beyond a reasonable doubt standard of proof is contrary to the Supreme Court's longstanding recognition that death is different, and for that reason requires heightened reliability in the determinations underlying

capital punishment.  Specifically, the Supreme Court has clearly established that

"the Eighth Amendment requires a greater degree of accuracy . . . than would be

true in a noncapital case."  Gilmore v. Taylor, 508 U.S. 333, 342, 113 S. Ct. 2112,

2117 (1993) (citation omitted).[4]  Because this principle ranks as "fundamental

enough" to the Supreme Court's post-Furman[5] Eighth Amendment death penalty

jurisprudence, the necessity to apply these principles to Georgia's beyond a

reasonable doubt standard is clear.  See Yarborough v. Alvarado, 541 U.S. 652,

666, 124 S. Ct. 2140, 2151 (2004) ("Certain principles are fundamental enough

that when new factual permutations arise, the necessity to apply the earlier rule will

be beyond doubt.").  But, by contrast, Georgia's requirement that a capital

defendant prove his mental retardation beyond a reasonable doubt "would seem

inevitably to enhance the risk of unwarranted" imposition of the death sentence

upon those who are mentally retarded.  Cf. Beck v. Alabama, 447 U.S. 625, 637,

---

[4]  See also Gardner v. Florida, 430 U.S. 349, 357, 97 S. Ct. 1197, 1204 (1977)  (plurality opinion) ("[D]eath is a different kind of punishment from any other which may be imposed in this country."); Lockett v. Ohio, 438 U.S. 586, 605, 98 S. Ct. 2954, 2965 (1978) (explaining rationale for requiring more reliable procedures in capital sentencing determinations to minimize the "risk that the death penalty will be imposed in spite of factors which may call for a less severe penalty"); Woodson v. North Carolina, 428 U.S. 280, 305, 96 S. Ct. 2978, 2991 (1976) (plurality opinion) ("Death, in its finality, differs more from life imprisonment than a 100-year prison term differs from one of only a year or two.  Because of that qualitative difference, there is a corresponding difference in the need for reliability in the determination that death is the appropriate punishment in a specific case.").

[5]  Furman v. Georgia, 408 U.S. 238, 92 S. Ct. 2726  (1972).

100 S. Ct. 2382, 2389 (1980) (reversing death sentence imposed after a jury verdict of guilt of a capital offense when the jury was not permitted to consider a verdict of guilt of a lesser included offense). Since Mr. Hill has already satisfied the state trial court that he is mentally retarded by a preponderance of the evidence, we should assume that "some characteristics of [Mr. Hill's] mental retardation undermine the procedural protections that our capital jurisprudence steadfastly guards." See Atkins, 536 U.S. at 317, 122 S. Ct. at 2250. "Such a risk cannot be tolerated in a case in which the defendant's life is at stake." Beck, 447 U.S. at 657, 1005 S. Ct. at 2389.

While federal habeas courts must accord state court decision substantial deference under AEDPA, we must be vigilant to "guard against extreme malfunctions in the state criminal justice systems." Harrington v. Richter, —U.S.—, —, 131 S. Ct. 770, 786 (2011) (quotation omitted). In my judgement, execution of a person who has already proven he is more likely than not mentally retarded, but who is unable to prove his mental retardation beyond a reasonable doubt, is an "extreme malfunction" that warrants the protection of the Great Writ.

For all of these reasons, as well as those expressed by Judge Barkett, I respectfully dissent from the majority opinion.